100 N.J. 432 (1985)
495 A.2d 1320
N.J. INDUSTRIAL PROPERTIES, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
Y.C. & V.L., INC., A NEW JERSEY CORPORATION, VITO LICARI, INDIVIDUALLY, AND YAFFA LICARI, INDIVIDUALLY, DEFENDANTS-RESPONDENTS.
The Supreme Court of New Jersey.
Argued February 20, 1985.
Decided July 31, 1985.
*433 Martin F. Siegal argued the cause for appellant (Farer, Siegal & Fersko, attorneys; Jack Fersko, on the brief).
Timothy Boderck argued the cause for respondents (Eichler, Forgosh, Gottilla & Rudnick, attorneys).
The opinion of the Court was delivered by GARIBALDI, J.
The sole question here is whether the landlord or the defaulting tenant receives the rent, in excess of that due under the original lease, that the landlord collects from a subsequent tenant for the unexpired term of the original lease. Specifically, the issue is whether the excess rent is to be applied retroactively as a full credit against the rent the prior defaulting tenant owes for the period the property was vacant. The landlord, New Jersey Industrial Properties, Inc. (N.J.I.P.), agrees that the defaulting tenant is entitled to credit in the amount of monthly rent due from the tenant for the rent paid by the subsequent tenant during the latter's occupancy of the premises for the unexpired term of the defaulting tenant's lease. However, the landlord denies the right of the defaulting tenant to have the excess rent applied retroactively as a credit against the unpaid rent the defaulting tenant owes for the period when the property lay vacant.

*434 I
On December 17, 1976, N.J.I.P. leased commercial property located at 42 Mileed Way, Woodbridge, New Jersey to Sheina Industries, Inc. (Sheina), which later changed its name to Y.C. & V.L., Inc. (Y.C.V.L.). The lease between N.J.I.P. and Sheina was for a term of five years and one month, commencing January 1, 1977 and terminating on January 30, 1982. The lease was a triple net lease, with the tenant responsible for maintaining the premises and for paying all utilities, taxes, and other charges associated with the property. In addition, the tenant agreed to an annual rent of $50,004, to be paid in equal monthly installments of $4,167. The monthly rent was later raised to $4,461.91.
The premises were to be used for manufacturing and sales, with space for offices and showrooms. On December 29, 1977, Vito Licari and Yaffa Chirnomas (later Yaffa Licari) (the Licaris), the principals of Sheina, executed a written guarantee in conjunction with the lease, covenanting and agreeing that if the tenant defaulted in the payment of rent or the performance of the covenants in the lease, they would pay all rent and damages that might arise out of the nonperformance of the lease to the extent of $26,000.
On July 7, 1977, the landlord agreed to Y.C.V.L.'s assignment of all of its rights, title and interest as tenant under the lease to Crayonne, U.S.A., Inc. (Crayonne). Pursuant to a rider to the lease, if the tenant defaulted, as assignor, Y.C.V.L. remained liable at all times for the full performance of the lease. In conjunction with the assignment, the Licaris agreed in writing that their personal guarantee survived the assignment, and, hence, that they would continue to be liable for the rent upon the tenant-assignee's default.
Crayonne occupied the premises for four years. In June 1981, it vacated the premises and stopped paying rent. On June 11, 1981, the attorney for the landlord notified Crayonne by letter that "[p]ursuant to paragraph 20th of the lease, you *435 are notified that the landlord terminates the lease and lease terms with respect to both premises by reason of your default in payment of rent and your abandonment of the properties * * *." By letter dated June 23, 1981 the landlord's attorney notified Y.C.V.L. and the Licaris that Crayonne had abandoned the premises and had failed to pay the June, 1981 rent and other additional rent; that by reason of the breach by Crayonne, the landlord had terminated the lease; that as assignor and pursuant to paragraph 25 of the lease, Y.C.V.L. was liable to the landlord; and that in addition Vito Licari and Yaffa Licari were liable to the landlord as guarantors of the lease to the extent of $26,000.00 of damages suffered by the landlord.
Promptly after the property was abandoned, the landlord printed and posted signs in front of the property announcing its availability for rent. The landlord then distributed mailers to more than 300 brokers so that they could advertise the premises. Nevertheless, the property remained vacant for four months, from June through September, 1981. In October, 1981, the landlord relet the premises to Insulation Distributors Corporation (Insulation). The new lease ran from October 1, 1981 to September 30, 1986 and provided for a monthly rental of $7,182.55 during the first two years of the lease. Thus, for the four months remaining on Crayonne's lease, the landlord received excess rent totalling $10,881.56.
In August, 1981 the landlord sued Y.C.V.L. and the Licaris for damages based upon the rent due under the original lease for the months of June through September, 1981, when the premises were vacant. This action was premised on the survival clause in paragraph 25 of the lease, which extends the tenant's liability beyond the time that the lease was expressly terminated.
The landlord alleges that damages should be measured on the basis of rent lost monthly, thereby creating a separate and independent cause of action for each month in which there was a deficiency in rent. Accordingly, the landlord gave Y.C.V.L. a *436 credit in the amount of monthly rent due from it for rent received from the subsequent tenant for the remaining term of the original lease, but did not extend a credit of the excess rent to Y.C.V.L. for any of the rent due for the period when the property was vacant prior to Insulation's occupancy. Consequently, N.J.I.P. determined that Y.C.V.L. owed $17,846.64 in rent, for the four months when the property remained vacant.[1]
In contrast, the Licaris, guarantors of the defaulting tenant, claim that the defaulting tenant is entitled to a credit of the excess rent against the rent it owes for the period the property was vacant prior to the subsequent tenant's occupancy. The defaulting tenant alleges that the entire period of the original lease is the proper period for measuring damages. The Licaris argue that for the remaining period of the original lease the landlord will receive from them 4 months rent, from June, 1981 to September, 1981, and 4 months rent from Insulation for October, 1981 to January, 1982, for a total rent of $45,398.00. If the defaulting tenant had remained on the premises during the entire lease term, the landlord would have received $33,336.00 for the same period. Consequently, the landlord will receive $12,072.00 more than it would have received under the original lease if there had not been a default. Thus, the landlord received the excess rent because of the defaulting tenant's breach of its lease; ergo, the defaulting tenant should be entitled to a credit for this excess rent. Under this theory, if the excess rent exceeds the tenant's liability, the defaulting tenant, rather than the landlord, is entitled to receive all of the excess.
The landlord contends that this result gives a windfall to the breaching tenant, is basically unfair, and fails to comport with the lease or the reasonable expectations of the parties. The landlord argues that the tenant's position penalizes the landlord *437 for mitigating its damages and rewards the defaulting tenant for its wrongful breach of the lease. If the landlord had immediately re-let the premises at the higher rent, by applying the principle espoused by the defaulting tenant, the tenant would have been entitled to a payment from the landlord in addition to the credit it would have received for the rent owed under the lease.
The trial court held for the landlord. In awarding the landlord damages of $19,636.14 (which consists of rent, repairs, cleaning, utilities, insurance, etc., and credits for security and tax escrow), the court stated:
Plaintiff gave defendants credit for rent and additional rents received from Insulation from October 1, 1981 until January 30, 1982, the remainder of the term of the lease. Defendants are not entitled to a credit for the surplus rent paid by Insulation over and above the monthly rent due from Y.C. & V.L.
The Appellate Division affirmed the trial court in all respects except for the amount of credit it gave the defaulting tenant. The Appellate Division found that paragraph 10 of the lease "expressly recognizes that after reimbursement of the landlord's reentry expenses, all of the balance of subsequent tenant's rent is to be applied to the defaulting tenant's account even if that balance exceeds the defaulting tenant's own rent obligation." (Emphasis in original). Accordingly, the Appellate Division held that the excess rent received from the subsequent tenant was to be applied towards the rent due from the defaulting tenant for the period during which the property was vacant.
We granted the landlord's petition for certification, 97 N.J. 690 (1984), limited to a determination of the amount of the credit the defaulting tenant is entitled to receive.

II
We first examine the terms of the lease to determine whether the defaulting tenant is entitled to credit the excess rent the landlord received from the subsequent tenant towards the unpaid rent it owed for the time the property was vacant. *438 While no provision in the lease specifically addresses the issue of who receives "excess rent," several lease provisions are relevant.
The lease provides the landlord with two alternative methods by which to reenter the premises: (1) as the agent for the tenant pursuant to paragraph 10, or (2) on its own behalf, having terminated the lease pursuant to paragraph 20. If the landlord enters as the agent of the tenant, the tenant remains liable for the rent during the vacancy and for any deficiency upon reletting. If, however, the landlord enters on its own account, the law implies an acceptance of the tenant's surrender, thereby relieving the tenant of any future liability. Consequently, the amount of damages a landlord may recover depends on whether the landlord relets for its own account or for the account of the tenant. See 52 C.J.S. Landlord and Tenant, § 498 (1968).
In this case, the Appellate Division relied on paragraph 10 of the lease to determine that the landlord entered the premises as an agent of the tenant, and therefore the tenant was entitled to a credit in the amount of actual rent received by the landlord. Paragraph 10 provides:
10th: That if the said premises, or any part thereof, shall become vacant during the said term, or should the Tenant be evicted by summary proceedings or otherwise, the Landlord or Landlord's representatives may re-enter the same, either by force or otherwise, without being liable to prosecution therefor; and re-let the said premises as the Agent of the said Tenant and receive the rent thereof; applying the same, first to the payment of such expenses as the Landlord may be put to in re-entering and then to the payment of the rent due by these presents; the balance (if any) to be paid over to the Tenant who shall remain liable for any deficiency.
We find no support for the Appellate Division's reliance on paragraph 10. It is undisputed that the landlord terminated the lease pursuant to paragraph 20[2] and reentered the premises *439 pursuant to paragraph 15.[3] When Crayonne abandoned the property and defaulted in the payment of rent, the landlord notified Crayonne and then the Licaris that it was terminating the lease pursuant to paragraph 20. Thus, the landlord did not enter the premises as the agent for the tenant, but for its own account under paragraph 15.
The law in this state provides an exception to the rule that when a landlord terminates a lease, reenters the premises, and relets for his own account, the tenant is relieved of any future liability for the rent. Parties to a lease may agree that certain obligations will survive the termination of the landlord-tenant relationship. 49 Am.Jur.2d Landlord and Tenant, § 559, p. 1055; Restatement (Second) of Property, § 12.1, Comment g. Leases with survival covenants are enforceable in New Jersey.[4]See Fibish v. Bennett, 131 N.J.L. 98, 99 (Sup.Ct. *440 1943), aff'd, 132 N.J.L. 168 (E. & A. 1944); Raleigh Realty Corporation v. Jacobs, 127 N.J.L. 454, 455 (Sup.Ct. 1941); Fleming v. Matter Construction Corp., 11 N.J. Misc. 129, 132-33 (Hudson County Ct. 1933).
In this case, there is a survival covenant in paragraph 25, which provides:
25th. In the event that the relation of the Landlord and Tenant may cease or terminate by reason of the re-entry of the Landlord under the terms and covenants contained in this lease or by the ejectment of the Tenant by summary proceedings or otherwise, or after the abandonment of the premises by the Tenant, the Tenant shall remain liable and shall pay in monthly payments the rent which accrues subsequent to the re-entry by the Landlord, and the Tenant shall pay as damages for the breach of the covenants contained in this lease the difference between the rent reserved and the rent collected and received, if any, by the Landlord, during the remainder of the unexpired term, such difference of [sic] deficiency between the rent reserved and the rent collected, if any, shall become due and payable in monthly payments during the remainder of the unexpired term, as the amounts of such difference or deficiency shall from time to time be ascertained.
Thus, the record establishes that the lease was terminated pursuant to paragraph 20 and the landlord reentered the premises under paragraph 15 for his own benefit and not as an agent of the tenant. Under paragraph 25 the tenant remained liable for the rent accruing after the termination of the landlord-tenant relationship. Pursuant to that paragraph the tenants also agreed to pay as damages the difference between the rent reserved and the rent collected and received, if any, as a result of reletting.
*441 Both parties rely on paragraph 25 for support of their positions. The landlord relies on paragraph 25 to establish that damages are to be based on the monthly lost rent, thus creating a separate and independent cause of action for each month in which there is a deficiency in rent. The defaulting tenant relies on paragraph 25 to show that the proper period for measuring damages is the entire period of the lease. The Appellate Division found that paragraph 25 establishes the manner but not the quantum of payment.
While paragraph 25 does not expressly provide for the situation before us, namely, whether the landlord or the prior defaulting tenant should get the excess rent, similar provisions have been interpreted as providing that after a lease is terminated, a separate and independent cause of action for damages accrues each month, for the rent due until the end of the lease period.
In McCready v. Lindenborn, 172 N.Y. 400, 65 N.E. 208 (1902), language similar to paragraph 25 was at issue. There the lease provided that the tenant would pay "as damages for breach of the covenant for rent" the difference between the rent reserved and the rent received, "in equal monthly payments, as the amount of such difference shall from time to time be ascertained." Id. at 407, 65 N.E. at 210. Based on that lease provision, the court held that damages would be measured by the rent lost monthly, not the total rent lost at the end of the lease term. Further, the court held that the landlord "was at liberty to allow the causes of action for monthly deficiency to accumulate, and to recover upon several at the same time." Id.
As Justice, then Judge, Cardozo stated in Hermitage Co. v. Levine,
* * * How often and when shall the damage be computed? Is there to be a single cause of action in which all the damage will be computed down to October, 1945, or are there to be monthly causes of action to recover successive deficits, though conceivably new leases made when the present ones are over will make the net result a surplus?
No doubt, a damage clause can be drawn in such a way as to make a tenant responsible for monthly deficits after the re-entry of his landlord, and this *442 without charging the landlord with a duty to account for a surplus in other seasons. Such a clause will be found in McCready v. Lindenborn, 172 N.Y. 400, 65 N.E. 208, where the lease was to the effect that the tenant would pay the difference in rent "in equal monthly payments as the amount of such difference shall from time to time be ascertained." [248 N.Y. 333, 162 N.E. 97, 98 (1928) (emphasis added).]
In Hermitage, such a clause was not present. Hence, the court held that damages arising from the reletting would be based on a single cause of action, the deficiency to be ascertained when the term ended. The court noted, however, the great hardship this decision imposed on a landlord by postponing a cause of action until the end of the term. "The hardship is so great as to give force to the argument that postponement to a date so distant may not reasonably be held to have been intended by the parties." Noting that the outcome in this case was the result of poor draftsmanship, the court nevertheless required the landlord to wait until the end of the lease term to ascertain the deficiency. Had there been a "McCready clause" in the lease it is clear the holding would have been otherwise.
Here, the draftsman was careful to insert in the lease paragraph 25, establishing not only the manner of payment but also the quantum of payment. This interpretation avoids not only a totally impractical result but also avoids, as Justice Cardozo noted in Hermitage, a great imposition on the landlord. Assume, for example, a situation in which a landlord relets for the fifteen-year unexpired portion of a lease that has been terminated. Without such an interpretation, the landlord would have to wait until the end of that fifteen-year period in order to calculate the rent owed by the breaching tenant for the period left on his lease at the time of his breach. And more complicated calculations would be involved were the second tenant also to breach his lease. Moreover, determining the "excess" rent can itself be a difficult procedure; terms of leases of commercial property differ substantially. In order to avoid these complications, the lease provides for the calculation of the rent owed by the breaching tenant each month after the lease is breached, rather than requiring the landlord to await the end of *443 the lease term to calculate damages based on the aggregate rent collected from reletting.
Further, as Justice Cardozo noted in Hermitage, supra, 162 N.E. at 98, this result conforms with the reasonable expectations of the parties. When, as here, the parties have inserted a provision such as paragraph 25 in their lease, we think that the most reasonable belief attributable to the parties when the reletting yields a higher rent than does the original lease, is that the credit due the breaching tenant is to be limited to the period during which the second tenant leased the premises. Certainly, no landlord could expect that the excess rent he received from a subsequent tenant would accrue to the benefit of the breaching tenant.

III
While few courts have addressed this issue, most courts that have considered it, including New Jersey's Court of Errors and Appeals, have held that the defaulting tenant was not entitled to credit the excess rent the landlord received from a subsequent tenant towards the unpaid rent owed by the original tenant for the period of time the property was vacant. See 49 Am.Jur.2d, Landlord and Tenant, § 623, p. 597 (the tenant "after having violated his lease by abandoning the premises," may not turn its breach into a gain "by asserting a claim to the excess of the rental obtained on the reletting above that provided in its lease."); Restatement (Second) of Property, § 12.1, Reporter's Note (1977) ("* * * what authority there is denies the tenant the excess on the principle that it would allow the tenant to profit by his breach.")
In support of its conclusion the Restatement cites Whitcomb v. Brant, 90 N.J.L. 245 (E. & A. 1917). In that case, the Court held that although the premises may have been relet for the benefit of the original lessee, in order to reduce his liability for having violated his lease by abandoning the premises, he could not turn that breach into a gain by asserting a claim to the *444 excess rent obtained from reletting. The Whitcomb court rejected the original lessee's claim that his estate as a tenant had not been terminated and he was therefore entitled to the increased monthly rent that the new letting yielded during the time of the original lease. The Court held that the tenant's abandonment of the premises without the consent of the landlord severed his privity of estate, but did not terminate the privity of contract, which still imposed upon the tenant the obligation to pay rent under the lease. Whitcomb, supra, 90 N.J.L. at 248 (citing Hunt v. Gardner, 39 N.J.L. 530 (Sup.Ct. 1877); Creveling v. DeHart, 54 N.J.L. 338 (Sup.Ct. 1892)). Unable to find support in any legal principle for awarding a retroactive credit to the breaching tenant, the Court also refused to imply a right of action "in favor of one who by the voluntary violation of his covenant, produces a status of nonfeasance and default, from which acts of deliction he seeks to reap a benefit and extract a reward; an anomaly, as we have seen, which can find no support in legal principle." Id. at 251. The Court allowed the tenant a credit from the reletting only to the extent of the rent that accrued under the original lease after the new tenant's occupancy.
The tenant's claim for a credit based on the excess rent was similarly denied in Trick v. Eckhouse, 82 Ind. App. 196, 145 N.E. 587 (App.Ct. 1924). The court refused to allow the defaulting lessee to profit from the reletting.
The fact that [the landlord] was able to rent the property at an increased rental is no reason why she should not recover the rent for the two months the building was vacant * * *.
[145 N.E. at 588.]
In Schooley v. Wilker, 33 Ohio App. 462, 169 N.E. 829 (Ct.App. 1929), the court denied the tenant's claim for excess rent, and questioned:
* * * by what parity of reasoning can the old tenant claim the benefit of a higher rent to a new tenant? His obligation had accrued, and there was no contractual relation in any way as far as he is concerned with the new tenant. The old tenant had abandoned, he had vacated the premises, and turned them over, and his obligation was a fixed, determined obligation, and he had nothing *445 coming to him in any way from the increased rental, because his rights in the premises had ceased. The only thing that he can be thankful for is that the property was rented at all, and for enough to hold him harmless for the period of time that it was occupied after the 15th of October [when the reletting commenced]. For, in our judgment, had the landlord rented it for a less sum, and signified his intention to hold the former lessees responsible for the difference, he could have done so.
[169 N.E. at 830.]
Nor did the court credit the tenant in D.H. Overmeyer Co., Inc. v. Blakeley Floor Covering, Inc., 266 So.2d 925 (La. Ct. App.), cert. & writ denied, 263 La. 615, 268 So.2d 676 (1972):
[W]e cannot permit the additional rent collected from the second tenant to apply retroactively to offset that portion of defendant's debt which accrued prior to the second lease. Defendant had had the use of the property during that time and the full rent had been earned by its occupancy and possession. The credit to which defendant is entitled is limited to its rental obligations during the existence of the second lease.
[Id. at 927.]
In Waxman Industries, Inc. v. Trustco Development Co., 455 N.E.2d 376 (Ind. Ct. App. 1983), a recent case with facts paralleling the facts in this case, the court held that since the landlord had terminated the lease, the damages that accrued to the landlord became fixed at the date of termination and the tenant was not entitled to any credit for the months prior to termination. Id. at 379. The fact that the lease in Waxman was not terminated until the premises had been relet, rather than by the landlord upon learning of the first tenant's abandonment, as in this case, does not serve as a basis for distinguishing Waxman. The controlling fact in the Waxman decision was that the lease had been terminated:
A different result was reached in Wanderer [v. Plainfield Carton Corp., 40 Ill. App.3d 552, 351 N.E.2d 630 (1976)], only because the facts reflected that the lessor had not in fact terminated the lease by notice. [Id.]
In Wanderer the trial court's decision for the landlord was reversed and a credit for the breaching tenant was allowed. The court allowed the landlord to recover only its actual losses, crediting the tenant with the excess rent Wanderer received from the reletting. However, the court made it abundantly clear that

*446 [i]f the lease was in fact terminated by notice so as to relieve the tenant of any fu[r]ther obligations for rent, the damages then accruing to the landlord could have become fixed and the tenant would be released from all further liability. If such were the case, * * * there would be no credit for the tenant by reason of the excess rent. * * * We find no support in the record for a conclusion that the obligations of Plainfield Carton [original tenant] were released or terminated when Acoustiflex [second tenant] moved in. [Wanderer, supra, 351 N.E.2d at 637.]
The weight of opinion in other jurisdictions is that when the lease has been terminated at the time the property is relet for the landlord's account, the fact that the property is leased at a higher rental than under the terminated lease does not redound to the benefit of the former tenant.[5] We agree. Here, because the landlord terminated the lease and reentered the premises on its own account pursuant to paragraph 25 of the lease, and not as the tenant's agent pursuant to paragraph 10, the tenant is not entitled to a credit by reason of the surplus rents collected.

IV
In deciding this case, we look not only to the law of property and contracts, but also consider notions of fairness and equity. Such consideration is relevant in recoveries in breach of contract cases. In P. Linzer, "On The Amorality of Contract *447 Remedies  Efficiency, Equity, and the Second Restatement," 81 Colum.L.Rev. 111 (1981), a survey of recent contract cases disclosed the emphasis placed on such considerations in many cases.
This survey of recent cases does not suggest that all courts have abandoned the view that damages are the primary form of relief. It shows, rather, that many courts have compared remedies to determine which would be more effective in giving a disappointed promisee his full expectation interest, and have decreed specific performance in circumstances in which equity would traditionally have denied relief. Although their rationales have varied and they have not spoken in terms of economic efficiency, these courts have in fact considered the full cost to promises of nonperformance and the real value to them of the bargain that they made. In addition, there is often at least a hint of the view that people should be held to their promises, and that the only effective way to do this is to grant specific performance.

[Id. at 130 (emphasis added).]
In explaining the results in these cases, the author concludes,

More important, it is simply right that one get what he was promised. This is not the place to figure out why we enforce promises, but surely there is a reason beyond efficient allocation of resources. The origins of enforcement may be religious, or religion may have been used to achieve utility, but I think that today most people believe that one should stand by one's word. * * * But most important are fairness and justice.

[Id. at 138-39 (footnotes omitted).]
Thus, as between the wrongdoer, the defaulting tenant here, and the landlord, who promptly attempted to mitigate his damages, any benefit must go to the landlord.[6] Principles of fairness demand no less.
In other areas of the law, courts in this state have not allowed a wrongdoer to benefit from his wrongful actions. Sporn v. Celebrity, Inc., 129 N.J. Super. 449 (Law Div. 1974), was a suit for wrongful discharge of employment in violation of an alleged oral employment contract. There the court held that the defendant was not entitled to a mitigation of damages by *448 the amount of unemployment compensation received by the plaintiff. Although the court recognized that mitigation is "always a matter to be considered where contract damages are in issue," the court held that the employer should not have a benefit conferred upon him when he is the wrongdoer. Id. at 456, 459. In concluding that the reasons for denying mitigation were more persuasive than those favoring it, the court noted that
New Jersey courts have tended to permit what might appear as a form of double recovery by a plaintiff under such circumstances rather than allow reduction of the damages to be paid by the defendant wrongdoer.
[Id. at 459.]
Considerations of both fairness and equity also justified our decision in Theobald v. Angelos, 44 N.J. 228 (1965). In that case, one of the defendants in a personal injury action settled with the plaintiff before trial, but the jury later found that the settling defendant was not culpable. The culpable defendant sought a reduction of the jury verdict that would reflect the amount already received by the plaintiff. The question was whether the plaintiff or the defendant should be "unjustly" enriched if there in fact was any "unjust" enrichment. Id. at 239. In holding that the nonsettling defendant was not entitled to a pro rata reduction of the jury verdict by virtue of the settlement, we emphasized that if there was enrichment, it was not at the defendant's expense. In addition, the defendant was not seeking to make the settling nonculpable defendant whole, "but rather to profit from the injustice that [the latter] supposedly experienced." Id. at 240.
If there is an inequity that, by virtue of the facts of this case, must fall on either of the parties, we have decided that it should fall on the party who breached the lease. The defaulting tenant should not get the benefit of his breach. It is clear that the landlord promptly moved to mitigate the tenant's damages. Fairness dictates that excess rent belongs to him and not the defaulting tenant. When a tenant breaches a lease and abandons the premises, it is the landlord who is left with an empty *449 building, the concomitant risks of fire, theft, and vandalism, and the burden of finding another tenant. We therefore hold that notions of fairness preclude the breaching tenant from benefitting from his breach in this case.

V
We reverse the judgment of the Appellate Division with respect to the amount of credit the defaulting tenant is entitled to receive. We hold that a landlord who relets property during the unexpired period of a breaching tenant's lease, for rent in excess of that due under the original lease, such as the one in this case, is entitled to the excess rent. The landlord need not credit such excess rent against the unpaid rent owed by the defaulting tenant for the period when the property was vacant, prior to the subsequent tenant's occupancy. This decision is supported by the law of New Jersey and most other jurisdictions that have addressed this narrow issue. It also comports with basic fairness and the reasonable expectations of the parties.
STEIN, J., dissenting.
In this case the assignee of a commercial tenant abandoned the leased premises and defaulted in the payment of rent. The landlord terminated the lease, but asserted its contractual right under a survival clause to hold the original corporate tenant and two individual guarantors liable for the rent reserved to the end of the term. Before the lease term expired, the landlord entered into a new lease for the property at a higher monthly rent. The issue before us is the proper measure of damages that should determine the original tenant's and guarantors' liability to the landlord. Specifically, should the original tenant and guarantors receive a credit against their liability for all of the rent the landlord will receive until the end of the original term, or should the credit be limited by the amount of the monthly rent under the original lease?
*450 The majority holds that the original tenant's and guarantors' credit against their total liability cannot in any given month exceed the rent reserved in the original lease. For this conclusion it relies on the proposition that "as between the wrongdoer, the defaulting tenant here, and the landlord, who promptly attempted to mitigate his damages, any benefit must go to the landlord." Ante at 447.
Not only do I disagree with the majority's reliance on equitable principles to decide this case, but I believe that its reliance is based on a misconception as to the conduct of the respective parties. Furthermore, in my view the majority ignores the growing modern trend in the interpretation of leases to replace antiquated precepts of property law with the more relevant principles of contract law. I respectfully dissent.

I
Plaintiff, New Jersey Industrial Properties, Inc. (NJIP), is the owner of a large industrial building in Woodbridge. In December, 1976, it leased the premises to Sheina Industries, Inc. (Sheina), for a period beginning January 1, 1977 and ending January 30, 1982. The lease initially provided for an annual rent of $50,004, payable in equal monthly installments of $4167, and the tenant was obligated to pay for utilities, taxes, and maintenance. A rider to the lease increased the monthly rent to $4461.91 commencing August 1, 1977, but reduced the rent to $2000 per month during the first seven months of the term. The lease was personally guaranteed by Yaffa and Vito Licari, the officers of Sheina, up to a maximum joint liability of $26,000.
In addition to the building, the leased premises included a loading dock and parking area for trucks and tractor trailers. Sheina used the premises for the manufacture and sale of plastic houseware products. In July, 1977, Sheina sold its assets to an unaffiliated company, Crayonne, U.S.A., Inc. (Crayonne). Concurrently, Sheina assigned its lease to Crayonne *451 with the landlord's consent. As a condition of the assignment, Sheina and the Licaris were to remain liable under their respective lease and guaranty agreements.
Pursuant to the contract with Crayonne, Sheina's name was changed to Y.C. & V.L., Inc. (YCVL). Subsequent to the sale and assignment, Yaffa and Vito Licari were employed by Crayonne for approximately one year, after which they had no further dealings with Crayonne or the leased premises. After leaving Crayonne's employ, the Licaris started a new plastic houseware products business in Cliffwood Beach under the name Basic Line, Inc.
Crayonne occupied the leased premises for almost four years until June, 1981, when it abandoned the property without prior notice. On June 11, 1981, NJIP notified Crayonne that pursuant to paragraph 20 of the lease, it was terminating the lease for failure to pay rent and abandonment. On June 23, 1981, NJIP advised YCVL and the Licaris that Crayonne's lease had been terminated due to the latter's breach. The letter demanded that YCVL pay the June rent and real estate tax payment as well as a roof repair bill of $293.95. The letter also asserted a claim for future rent and damages in an unspecified amount. In addition, NJIP reminded the Licaris of their personal liability for damages up to $26,000.
It is undisputed that after receipt of NJIP's demand letter, Mrs. Licari telephoned the landlord's attorney and proposed that the Licaris' new houseware enterprise, Basic Line, Inc., occupy the premises. This proposal was either rejected or ignored by NJIP.
During the summer of 1981, without notice to defendants, NJIP incurred expenses of $6800 to repair and repave the parking lot and $4284 to clean and repair damage to the building that had been caused by Crayonne.
On August 20, 1981, NJIP leased the premises to Insulation Distributors Corporation (Insulation) for a five year term commencing *452 October 1, 1981 and terminating September 30, 1986.[1] The lease permitted Insulation to occupy the premises during September, 1981 for $1.00. During the first two years of the lease term the annual rent was $86,190.60, payable in monthly installments of $7,182.55. Thus, during the four months that the original lease and the Insulation lease overlapped, NJIP collected rent in the amount of $28,730.20, or $10,882.56 more than the rent payable under the original lease.
In August, 1981, the landlord sued YCVL and the Licaris, alleging unpaid rent and taxes for June, the $293.95 roof repair bill, interest, attorney's fees, and claims for unspecified damages not yet accrued. The complaint also alleged a claim against the Licaris to the extent of the $26,000 limit of liability under their guaranty.
In October, 1982, the landlord filed an amended complaint seeking rent, taxes, repairs, interest, expenses, and attorney's fees that accrued since the filing of the original complaint.
The trial court computed plaintiff's damages to be $32,958.42.[2] After deducting YCVL's security deposit and tax escrow payment totaling $13,322.28, the court awarded judgment for plaintiff in the amount of $19,636.14. In computing plaintiff's damages, the trial court credited the defendants with *453 that portion of the new tenant's rent that equaled the rent under the original lease for the period from October 1981 through January 1982, but it refused to credit defendants with Insulation's rent in excess of the original monthly rent.
Subsequently, the trial court considered plaintiff's application for counsel fees and entered an amended judgment against YCVL in the amount of $31,730.42, consisting of the original judgment of $19,636.14, attorney's fees and costs of $11,290.76, and interest of $753.53.[3] An amended judgment against the individual defendants was entered in the amount of $26,000.
The Appellate Division reversed the trial court's computation of damages, concluding that the terms of the lease agreement as well as general principles of compensatory damages required that the tenant and guarantors receive a credit for all rent received by the landlord from the date of the lease termination to the end of the lease term. We granted certification as to this issue only. 97 N.J. 690 (1984).

II
A proper resolution of the issue in this case requires an historical perspective. Because a lease was traditionally regarded as a conveyance of an interest in real estate, courts have traditionally relied upon principles of property law in resolving disputes between parties to a lease. Javins v. First Nat'l Realty Corp., 428 F.2d 1071, 1074 (D.C. Cir.), cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).
*454 For example, at common law a landlord had no duty to mitigate damages caused by a defaulting tenant. See Sommer v. Kridel, 74 N.J. 446, 452 (1977). This rule was based on the theory that a lease effected a transfer of part of the owner's property interest. As we observed in Sommer v. Kridel, supra:
Under this rationale the lease conveys to a tenant an interest in the property which forecloses any control by the landlord; thus, it would be anomalous to require the landlord to concern himself with the tenant's abandonment of his own property. Wright v. Baumann, 239 Or. 410, 398 P.2d 119, 120-21, 21 A.L.R.3d 527 (1965). [74 N.J. at 453.]
Although this rule no longer applies to residential leases in this state, we have expressly reserved for decision its application to leases of commercial property. Sommer v. Kridel, supra, 74 N.J. at 456-57 & n. 4.
The principles of property law that argue against the landlord's duty to mitigate damages severely restricted the landlord's options at common law in the event of a tenant's default. For example, a landlord who sought to enter the leased premises after default, rent to a new tenant, and hold the original tenant liable for any losses was confronted with the rule that such conduct constituted a surrender of the original lease by operation of law. The common-law theory that two exclusive possessory rights to the same land could not coexist simultaneously required that the prior tenancy be expunged in favor of the new one. C. McCormick, "The Rights of the Landlord Upon Abandonment of the Premises by the Tenant," 23 Mich.L.Rev. 211, 212 (1925). If, however, either with the defaulting tenant's consent, or pursuant to the express provisions of the lease, the landlord made a new lease as the tenant's agent and for his account, no surrender by operation of law occurred. Id. at 212-13. Indeed, an entry by the landlord after the tenant's default, even without a reletting, could cause a surrender or forfeiture of the leasehold estate. Id. at 213-14.
If the landlord continued to recognize the lease and allowed the premises to remain vacant, his right of recovery was ordinarily limited to the rent as it became due. 2 R. Powell *455 and P. Rohan, Powell on Real Property (1983 ed.) ¶ 230[3] at 326-27 [hereinafter Powell on Real Property]; Restatement (Second) of Real Property § 12.1, comment (i), illustrations 10 & 11 (1977); J. Hicks, "The Contractual Nature of Real Property Leases," 24 Baylor L.Rev. 443, 516 (1972).
Because of widespread dissatisfaction with the impact that these antiquated rules of property law have had on modern lease transactions, lessors and lessees have made distinct efforts to overcome them with express covenants that override their restrictions. As a result, the modern lease is often based on property law principles modified by specific covenants that permit the intention of the parties to supersede those doctrines no longer viable in our society:
The complexities of city life, and the proliferated problems of modern society in general, have created new problems for lessors and lessees and these have been commonly handled by specific clauses inserted in leases. This growth in the number and detail of specific lease covenants has reintroduced into the law of estates for years a predominantly contractual ingredient. [Powell on Real Property, supra, ¶ 221[1] at 180-81.]
It is one thing to recognize the general impact that modern contract principles have had upon the real property lease; it is more difficult, however, to apply those principles in a manner that reflects their inherently contractual character, free from the taint of the property law principles that they were designed to overcome. As Judge Wright observed in Javins v. First Nat'l Realty Corp., supra:
Ironically, * * * the rules governing the construction and interpretation of "predominantly contractual" obligations in leases have too often remained rooted in old property law.
Some courts have realized that certain of the old rules of property law governing leases are inappropriate for today's transactions. In order to reach results more in accord with the legitimate expectations of the parties and the standards of the community, courts have been gradually introducing more modern precepts of contract law in interpreting leases. Proceeding piecemeal has, however, led to confusion where "decisions are frequently conflicting, not because of a healthy disagreement on social policy, but because of the lingering impact of rules whose policies are long since dead." [428 F.2d at 1074-75 (footnotes omitted).]
*456 New Jersey has been a leader in its recognition that the modern lease should be construed in accordance with principles of contract law. See Trentacost v. Brussel, 82 N.J. 214, 225-28 (1980) (landlord's implied warranty of habitability requires furnishing of reasonable safeguards to protect tenants from foreseeable criminal activity); Sommer v. Kridel, supra, 74 N.J. at 454-57 (antiquated real property concepts no longer control where there is a claim for damages under residential lease; landlord has duty to mitigate damages); Berzito v. Gambino, 63 N.J. 460, 468-69 (1973) (implied warranty of habitability and covenant to pay rent construed as mutually dependent); Marini v. Ireland, 56 N.J. 130, 141-47 (1970) (landlord's implied covenant to make repairs and tenant's covenant to pay rent construed as mutually dependent; landlord's breach of covenant entitles tenant to repair and offset cost of same against rent); Reste Realty Corp. v. Cooper, 53 N.J. 444 (1969) (recognizing implied warranty against latent defects and of fitness of premises for leased purposes).
A similar trend importing principles of contract law into real property leases can be discerned in other states, particularly with respect to the landlord's duty to mitigate damages. As noted, a duty to mitigate damages is incompatible with the property law concept that restricts a landlord's right to interfere with the defaulting tenant's property interest. C. McCormick, supra, 23 Mich.L.Rev. at 212-16. However, one commentator has observed that
the imposition of a landlord's duty to mitigate has received substantial endorsement in connection with residential leaseholds, and although there has been less readiness to accept the principle for commercial leases, the trend in that direction is clear. Despite contrary pronouncements, the no-mitigation duty rule appears to be a moribund doctrine. [G. Weissenberger, "The Landlord's Duty to Mitigate Damages on the Tenant's Abandonment: A Survey of Old Law and New Trends," 53 Temp.L.Q. 1, 5-6 (1980) (footnotes omitted).]
At least twenty states, either by statute or by judicial decision, impose upon a residential landlord a duty to mitigate damages, and ten states expressly recognize a duty to mitigate with respect to commercial leases. Id. at 8-10 & nn. 33 & 36. See *457 generally Model Residential Landlord-Tenant Code § 2-308(4) (Tent.Draft 1969) (imposing a duty on landlord to mitigate damages); Uniform Residential Landlord and Tenant Act § 1.105(a) (1972) (imposing a duty to mitigate on both landlords and tenants).
Judicial recognition of acceleration clauses in lease agreements reflects another incursion of contract principles into the realm of property law. Powell on Real Property, supra, § 231[3][b] at 330.60(98)-330.60(101); Note, "The Validity of Lease Acceleration Clauses Under a Contractual Approach to the Landlord-Tenant Relationship," 10 Cap.U.L.Rev., 159, 165 (1980). The general rule regarding lease acceleration clauses is that if the tenant abandons the premises,
the landlord may enforce the acceleration clause if he does not terminate the lease. In this event, the landlord will receive the rent for the remainder of the term from the tenant who abandoned, and is obligated to account to him for any rent received from a new tenant. [Restatement (Second) of Property, supra, § 12.1, comment k.]
See Powell on Real Property, supra, § 231[3][b] at 330.60(102).
Another contractual clause intended to supersede the rigid property-oriented rules of the common law  and the clause specifically at issue in this case  is the "survival" clause, which customarily provides that even though the lessee has been removed from possession of the leased premises because of a material breach, the lessee's obligation to pay damages based on lost rent "survives" the loss of possession. The majority rule as to survival clauses is that
the parties may agree that the tenant is liable for subsequent "rents" as they accrue. Such statement must be clear and will be strictly construed against the landlord. Generally, the landlord's recovery is limited to the deficiency in rents if he does relet, or to his actual damages, thus making the remedy look more like damages than rent. [Powell on Real Property, supra, § 231[1] at 330.52-330.53 (footnotes omitted).]
The use, validity, and contractual origin of survival clauses was explained by Professor McCormick in 1925, when he quoted with approval from a Texas decision upholding the right of a landlord to collect damages from an abandoning tenant for unpaid rent:

*458 "It is contended that the abandonment of the premises to the lessor, though against his wish, and with notice that he would hold the lessee responsible for the rent for the full term, and his subsequently letting the place to another tenant, was a surrender and termination of the lease, and that the plaintiff has no right to recover rent since the termination of the lease. * * * But it does not follow that because of the wrongful act of the defendant in the breach of his contract by the abandonment of the rented premises, when the landlord, to protect his property from the injury it might suffer from lying idle and abandoned, and having given the tenant due notice of his intention, lets the premises and puts another tenant in possession, that [sic] though the first tenant is not any longer responsible eo nomine for rent, he is absolved from all liability to make good the loss which the landlord may sustain from his failure to perform his contract. * * * The plaintiff in this case was entitled to recover, not, indeed, for rent of the premises after the abandonment of them by the defendants, but for compensation for the injury done him; and the proper measure of his damage is set out in the account upon which he sues; that is, the difference between the rent he was to receive and the rent he did receive, if that were the utmost for which, by the exercise of ordinary diligence, the premises could be rented. * * *" [C. McCormick, supra, 23 Mich.L.Rev. at 217-18, quoting Randall v. Thompson Bros., 1 Tex.Civ.App. § 1102 (Comm. App. 1881) (emphasis in McCormick).]
New Jersey recognizes and enforces survival covenants in leases. Fibish v. Bennett, 131 N.J.L. 98 (Sup.Ct.), aff'd per curiam, 132 N.J.L. 168 (E. & A. 1944); Raleigh Realty Corp. v. Jacobs, 127 N.J.L. 454 (Sup.Ct. 1941); Fleming v. Matter Constr. Corp., 11 N.J. Misc. 129, 132-33 (Hudson County Ct. 1933).

III
The lease in this case is faithful both to the historic precepts of property law and the more modern trends of contract law. Paragraph 10 of the lease afforded the landlord, in the event of tenant's breach, the right to relet the premises as the tenant's agent. Thus, the tenant would receive any surplus rents and remain liable for any deficiency, thereby thwarting the common-law doctrine that reletting by the landlord caused a surrender of the lease by operation of law. See C. McCormick, supra, 23 Mich.L.Rev. at 212-14.
*459 I agree with the majority that to the extent the Appellate Division in this case relied upon paragraph 10 of the lease, it did so improperly. In this case the landlord terminated the lease under paragraph 20, ante at 439, and such termination is inconsistent with the right afforded by paragraph 10 to relet as the tenant's agent. Accordingly, it is clear that the landlord relet for its own account pursuant to the survival clause of the lease in paragraph 25:
In the event that the relation of the Landlord and Tenant may cease or terminate by reason of the re-entry of the Landlord under the terms and covenants contained in this lease or by the ejectment of the Tenant by summary proceedings or otherwise, or after the abandonment of the premises by the Tenant, the Tenant shall remain liable and shall pay in monthly payments the rent which accrues subsequent to the re-entry by the Landlord, and the Tenant shall pay as damages for the breach of the covenants contained in this lease the difference between the rent reserved and the rent collected and received, if any, by the Landlord, during the remainder of the unexpired term, such difference of [sic] deficiency between the rent reserved and the rent collected, if any, shall become due and payable in monthly payments during the remainder of the unexpired term, as the amounts of such difference or deficiency shall from time to time be ascertained.
Although we were advised at oral argument that the body of the lease, including paragraphs 10 and 25, was drafted by the landlord's attorney  and therefore subject to the rule that any ambiguity be strictly construed against the draftsman, In re Miller, 90 N.J. 210, 221 (1982)  I find no ambiguity in the landlord's survival clause. In a historical context, the paragraph is simply a mixture of property concepts and contractual covenants. The requirement that the tenant "shall pay in monthly payments the rent which accrues subsequent to the re-entry by the Landlord" reflects the familiar property-law doctrine preventing a landlord from accelerating rental payments and restricting recovery to the rent as it becomes due. McCready v. Lindenborn, 172 N.Y. 400, 65 N.E. 208 (1902); Powell on Real Property, supra, § 230[3][b] at 326-27.
The heart of the survival clause is the requirement that

the Tenant shall pay as damages for the breach of the covenants contained in this lease the difference between the rent reserved and the rent collected *460 and received, if any, by the Landlord, during the remainder of the unexpired term, such difference of [sic] deficiency between the rent reserved and the rent collected, if any, shall become due and payable in monthly payments during the remainder of the unexpired term, as the amounts of such difference or deficiency shall from time to time be ascertained. [(emphasis added).][4]
This language affords the landlord not a claim for rent under the lease but a contractual claim for damages based on the survival clause. The amount of such damages, including the amount of any credit to the tenant from the landlord's reletting, should be based on accepted principles of contract law. See Powell on Real Property, supra, § 231[1] at 330.53; Restatement (Second) of Property, supra, § 12.1, Reporter's Note 7 ("[T]he parties may agree that `rent' is to continue after termination, and the obligation may be enforceable as damages, since the payments are not rent in the strict sense of the word."); J. Hicks, supra, 24 Baylor L.Rev. at 521 ("Thus, even if the lessee is no longer liable on the lease because of lack of privity of estate, he may still be liable as a party to a contract.").
Professor McCormick best explains the contractual nature of the lessor's claim under a survival clause:
Assuming the destruction of the relation and of the tenant's estate, it is submitted that the landlord's acts show no desire on his part to rescind or terminate the contract between the parties; they are, on the contrary, perfectly consistent with an intent on his part to hold the tenant liable as for a breach of the contract. Usually the tenant's abandonment has been accompanied by some present breach of covenant to pay rent, to repair, or the like, or even if not, his abandonment ought, it seems, to constitute an anticipatory breach, a repudiation in advance of his future obligations under the contract, and hence under the overwhelming weight of authority, the source of a cause of action in favor of the lessor for the value of the further performance of the contract. The value of such performance is of course the amount of the rent for the balance of the term, less the reasonable rental value or the amount received by the *461 landlord upon the reletting. [C. McCormick, supra, 23 Mich.L.Rev. at 217-18 (footnote omitted; emphasis in original).]

IV
A universally-accepted contract principle is that compensatory damages are designed to put the injured party "in as good a position as he would have been in had the defendant kept his contract." 11 S. Williston, A Treatise on the Law of Contracts § 1338 at 198 (3d ed. 1968); see 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 254 (1961); N.J.S.A. 12A:1-106 (Uniform Commercial Code  "remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed"); 5 A. Corbin, Contracts § 992 (1964). This principle has a broad and general application, not only to commercial contracts but also to leases of property. See Sommer v. Kridel, supra, 74 N.J. at 456-57 (duty to mitigate, which necessarily assumes damages to be compensatory); Spialter v. Testa, 162 N.J. Super. 421, 430 (Cty.D.Ct. 1978) ("New Jersey landlord-tenant law follows a basic principle. Landlords in residential tenancies are entitled to actual damages upon breach of lease by the tenant. The landlord is not entitled to any windfall profit when the tenant breaches."), aff'd, 171 N.J. Super. 181 (App.Div. 1979), certif. denied, 82 N.J. 300 (1980).
Since the purpose of the rule is to put the injured party in as good a position as he would have enjoyed but for the breach, it is generally accepted that damages are not recoverable for avoidable consequences. As Professor Corbin explains:
[T]he plaintiff is never given judgment for damages for losses that he could have avoided by reasonable effort without risk of other substantial loss or injury. Likewise, gains that he could have made by reasonable effort and without risk of substantial loss or injury by reason of opportunities that he would not have had but for the other party's breach are deducted from the amount that he could otherwise recover. [5 A. Corbin, supra, § 1039, at 241.]
See 11 S. Williston, supra, § 1353, at 274.
In this case we need not consider the obligation of a commercial landlord to mitigate damages, since the landlord voluntarily *462 did so.[5] The only question is whether we follow the normal rule of mitigation and credit defendants with all the rent received by the landlord until the end of the term. The majority declines to do this, and has fashioned a special rule for the mitigation of damages for breaching a lease: the tenant's credit in any month can never exceed the rent under the original lease.
It should be plainly understood that a landlord not wishing to share the bounty of a more lucrative lease with a defaulting tenant can achieve this result by terminating the tenant's liability prior to the inception of the new lease. In such event, the tenant is accountable for the landlord's damages up to the date on which its liability is terminated, and it will receive no credit for the rent paid by the new tenant.[6] This was the holding in Waxman Indus., Inc. v. Trustco Dev. Co., 455 N.E. 2d 376 (Ind. Ct. App. 1983), relied upon by the majority opinion.[7]
It is only when, as here, the landlord desires to preserve the original tenant's liability under the survival clause that the issue of so-called "excess rent" arises. In this situation, however, under generally accepted principles of contract law, the total rent received by the landlord until the end of the term should be credited against the tenant's liability, even if the new monthly rent exceeded the original monthly rent.[8] The applicable *463 principle is stated in the Restatement of the Law of Contracts:
After the plaintiff has reason to know that a breach has occurred, or that a breach is impending under circumstances such that it is not reasonable for him to expect the defendant to prevent harm, he is expected to take such steps to avoid harm as a prudent person would take. He cannot get damages for harm that could thus be avoided. Furthermore, gains that he could thus make, by reason of opportunities that he would not have had but for the breach, are deducted from the amount otherwise recoverable. [Id. § 336(1), Comment a, at 536 (1932) (emphasis added).]
See 5 A. Corbin, supra, §§ 1039, 1041 at 241, 256 (gains made by injured party on other transactions are deducted if the gains could not have been made but for the breach); C. Goetz & R. Scott, "The Mitigation Principle: Toward a General Theory of Contractual Obligation," 69 Va.L.Rev. 967, 975 n. 22 (1983) ("Joint minimization of costs generally requires that a mitigator credit the breacher with any new profits he obtains by virtue of the breach.").
Application of this general principle of mitigation in a commercial setting is discussed in Locks v. Wade, 36 N.J. Super. 128 (App.Div. 1955). There, plaintiff leased a juke box to defendant for two years at a minimum rental of $20 per week. Defendant repudiated the contract and plaintiff sued to recover lost profits for the two-year period of the lease. Defendant contended he was entitled to a credit since plaintiff was able to lease the component parts of the juke box to others after defendant's breach. Judge Clapp rejected defendant's contention and noted as follows:
Defendant would have us apply here the rule obtaining on the breach of an agreement to lease realty; that is, he claims the measure of the lessor's damages here is the difference between the agreed rental and the rental value of the property. His contention further is that even though under the agreement before us, the lessor is obliged to perform some personal services, he, in order to establish the rental value, has the burden of proving what he received on a reletting. * * *
* * * * * * * *

*464 We think the position plaintiff takes on the matter is sound. Where, as here, a plaintiff lessor agrees to lease an article of which the supply in the market is for practical purposes not limited, then the law would be depriving him of the benefit of his bargain if on the breach of the agreement, it required his claim against the lessee to be reduced by the amount he actually did or reasonably could realize on a reletting of the article. For if there had been no breach and another customer had appeared, the lessor could as well have secured another such article and entered into a second lease. * * *
* * * * * * * *
* * * In the case of realty which (unlike the juke box) is specific and not to be duplicated on the market, the lessor could not properly lease it to another for the same period unless the first lease were broken or terminated. In such a case the lessor should not be awarded two profits merely because of the first lessee's default.

So in general we may say that gains made by a lessor on a lease entered into after the breach are not to be deducted from his damages unless the breach enabled him to make the gains. [36 N.J. Super. 130-31 (emphasis added).]
In the instant case, defendant's breach clearly enabled plaintiff's gain. Hence, the damages suffered by plaintiff should be reduced by the amount of that gain.
The precise question before us was decided by the District of Columbia Court of Appeals in Truitt v. Evangel Temple, Inc., 486 A.2d 1169 (D.C.Ct.App. 1984). In that case, after twelve months of occupancy, the tenant abandoned the premises when its application for a certificate of occupancy was denied. The premises were vacant for eight months. The landlord sued for damages contending that the tenant had breached the lease by failing to pursue the necessary permits diligently or in good faith. The trial court found that the rent received by appellants from a substitute tenant during the balance of the unexpired term exceeded the rent reserved in the original lease and concluded that the landlord had suffered no damages. The landlord, as in this case, contended that its claim was for rent and that the tenant was not entitled to benefit from the excess rent paid by the new tenant. The Court of Appeals affirmed the trial court and its discussion of the issue is particularly pertinent to the question in this case:
[T]he only issue is whether the long established rule in the District of Columbia regarding the options available to a landlord upon a tenant's wrongful abandonment *465 should be modified when the landlord has gained an unanticipated net profit under a new lease. We are unpersuaded it should be. In Ostrow v. Smulkin, supra, 249 A.2d at 520 [1969], this court described the basic ingredients of a tenancy as consisting of the tenant's entitlement to possession and the landlord's entitlement to rent, but pointed out that
[i]f the landlord retakes possession by legal process or by accepting a voluntary surrender of possession by the tenant, the obligation of the tenant to pay future rent ceases.... And depending on the circumstances and contractual provisions of the lease, the tenant may be liable for damages even after the landlord has retaken possession, but this liability is for breach of contract and not for rent.

Id. at 521.
"In fixing the amount of damages, the general purpose of the law is, and should be," according to Professor Williston, "to give compensation, that is, to put the plaintiff in as good a position as he would have been had the defendant kept his contract." 11 WILLISTON ON CONTRACTS § 1338 at 198 (3d ed. 1968). "[C]ompensation involves not only assessment of gains prevented by the breach but also of losses ensuing which would not have occurred had the contract been performed. From these must be deducted any saving to the plaintiff due to the non-performance of the contract. The result will give the net loss to the injured party."

Id. at 202-03 (citing the RESTATEMENT OF CONTRACTS § 329). Moreover, while in some instances any "saving may be merely negative in being freed from the necessity of performance, [i]t may, however take a positive form when this freedom enables the injured party to acquire pecuniary advantages which he otherwise would not have been able to obtain." Id. at 203 n. 16. The cases relied upon by appellants are not to the contrary. For example, in Whitcomb v. Brant, 100 A. 175 (N.J. 1917), cited by appellants, the court affirmed dismissal of a suit by the original tenant to recover the incidental profits realized by the landlord upon his reletting of the premises to another tenant. The court held that after the landlord had obtained a new tenant and applied the rent received from the second tenant to relieve the original tenant of his obligation to pay rent, that was the extent to which the original tenant was entitled to benefit. The trial court did no more in the instant case. [486 A.2d 1173-74 (footnote omitted; emphasis added).]
Other cases that reached the same conclusion as the District of Columbia Court of Appeals are Dalamagas v. Fazzina, 36 Conn.Super. 523, 414 A.2d 494 (Super.Ct. 1979); Wanderer v. Plainfield Carton Corp., 40 Ill. App.3d 552, 351 N.E.2d 630 (App.Ct. 1976); The Way Int'l v. Ohio Center, 3 Ohio App.3d 451, 445 N.E.2d 1158 (Ct.App. 1982).
The majority opinion relies primarily on Whitcomb v. Brant, 90 N.J.L. 245 (E. & A. 1917). In that case the plaintiff-tenant, who had occupied the landlord's property for six years at a *466 monthly rent of $200, abandoned the premises in May, 1912. The property remained vacant for two months and the landlord then entered into a new lease for approximately three years at a rental of $225 per month. The original tenant sued, claiming that the excess rental under the new lease was his property. There was no counterclaim by the landlord for the two months' lost rent. Although the court denied the tenant's claim to recover affirmatively the excess rent, it acknowledged the tenant's right to have the rent received by the landlord under the new lease "applied pro tanto to benefit the plaintiff, and to relieve him to that extent under the obligation of the covenant." Id., 90 N.J.L. at 251. Since the landlord did not counterclaim, it is unclear if the Court meant that the plaintiff had been relieved of his obligation for the two months that the premises were vacant, in which event plaintiff would have been credited with the excess rent, or merely for the rental obligation during the period the property was occupied by the new tenant. The only clear principle that can be distilled from Whitcomb is that the tenant could not affirmatively recover the excess rent. Accordingly, the majority's reliance on that holding in this case appears to be misplaced.[9]
*467 The majority opinion also asserts that the defendants in this case are "wrongdoers" who should not be permitted to profit from the excess rent obtained by a landlord who voluntarily mitigates damages. However, the record indicates that the breaching party in this case was the defendants' assignee, and there is evidence that the defendants attempted to relet the premises but were rejected by the landlord. Other facts also suggest that the equities are not entirely with the landlord. For example, the landlord incurred repaving and cleaning expenses in excess of $10,000 without giving notice to defendants, and the new tenant was permitted to occupy the premises without paying rent for the month of September.
The majority opinion also errs in its reliance on language in the survival clause imposing on the tenant the obligation to make monthly payments of the difference between the rent received and the rent reserved, as the same may be ascertained. Incorrectly construing this language to impose a continuing liability on the tenant to pay rent, the majority concludes that since the obligation is for rent, the credit to offset that obligation should be limited to the monthly rental under the original lease. Ante at 441.[10] As noted above, however, the *468 tenant's continuing obligation under the survival clause is not for rent, since the lease has been terminated, but it is rather a contractual obligation to reimburse the landlord for its damages. Powell on Real Property, supra, § 231[1] at 330.53; Restatement (Second) of Property, supra, § 12.1, Reporter's Note 7; C. McCormick, supra, 23 Mich.L.Rev. at 216-17. The reference in the survival clause to monthly payments does no more than establish the dates on which the tenant's liability accrues; it does not define the nature of that liability.
As noted above, the equities in this case, wherever they lie, should not control the result. What should control are the fundamental and established principles of contract law that define the measure of damages based on the principle that the plaintiff be placed in as favorable a position as it would have enjoyed had the breach not occurred. Application of that principle, which is premised on fairness and equity, would suggest that the landlord is entitled to recover the full rent as originally reserved in the lease. To the extent that the defendants do not receive a credit for the total rent received by the landlord from October, 1981 to January, 1982, the landlord realizes a windfall and receives a benefit greater than that envisioned in his original bargain.
In my view, the majority has reached the wrong result in this case. It has done so by relying on the survival clause, a contractual remedy drafted by the landlord to overcome the restrictions imposed by property law on a landlord's right to terminate a lease, relet, and recover damages  a right not recognized at common law. By construing the survival clause to create a claim for rent rather than damages, the majority ignores the history and language of the survival clause and *469 perpetuates an unwarranted distinction, as to the measure of damages for breach, between leases and other contracts.
I would affirm the judgment of the Appellate Division.
For reversal  Chief Justice WILENTZ and Justices HANDLER, O'HERN and GARIBALDI  4.
For affirmance  Justices CLIFFORD, POLLOCK and STEIN  3.
NOTES
[1] 4 times $4,461.91, minus $1.00 credit for the rent Insulation paid in September.
[2] Paragraph 20 provides:

20th: It is expressly understood and agreed that in case the demised premises shall be deserted or vacated, or if default be made in the payment of the rent or any part thereof as herein specified, or if, without the consent of the Landlord, the Tenant shall sell, assign, or mortgage this lease or if default be made in the performance of any of the covenants and agreements in this lease contained on the part of the Tenant to be kept and performed, or if the Tenant shall fail to comply with any of the statutes, ordinances, rules, orders, regulations and requirements of the Federal, State and City Government or of any and all their Departments and Bureaus, applicable to said premises, or if the Tenant shall file or there be filed against Tenant a petition in bankruptcy or arrangement, or Tenant be adjudicated a bankrupt, or make an assignment for the benefit of creditors or take advantage of any insolvency act, the Landlord may, if the Landlord so elects, at any time thereafter terminate this lease and the term hereof, on giving to the Tenant five days' notice in writing of the Landlord's intention so to do, and this lease and the term hereof shall expire and come to an end on the date fixed in such notice as if the said date were the date originally fixed in this lease for the expiration hereof. Such notice may be given by mail to the Tenant addressed to the demised premises.
[3] Paragraph 15 provides:

15th: That if default be made in any of the covenants herein contained, then it shall be lawful for the said Landlord to re-enter the said premises, and the same to have again, re-possess and enjoy.
[4] This indicates the dual characteristics of a real property lease.

Where there is a lease the liability of the tenant arising by operation of law is not superseded by the contractual obligation. Both liabilities exist simultaneously. The lease has a dual character; it is a conveyance of an estate for years and a contract between lessor and lessee. The result is that dual obligations arise,  contractual obligations from the terms of the lease, and obligations under the law from the creation of the tenancy. As it is sometimes expressed, there are dual obligations arising from "privity of contract" and "privity of estate." See Samuels v. Ottinger, 169 Cal. 209, 211, 146 P. 638, 639, Ann.Cas. 1916E, 830. [Ellingson v. Walsh, O'Connor & Barneson et al., 15 Cal.2d 673, 104 P.2d 507, 509 (1940).]
See also J. Hicks, "The Contractual Nature of Real Property Leases," 24 Baylor L.Rev. 443, 452 (1972) (that authorities are unable to agree on whether a lease is a conveyance, a contract, or a conveyance with contractual obligations superimposed).
[5] Truitt v. Evangel Temple, Inc., 486 A.2d 1169 (D.C.App. 1984) relied upon by the dissent, is easily distinguishable from this case. In Truitt there was no breach by the tenant and no survival clause similar to paragraph 25. The clause at issue provided as follows:

This Lease Agreement and any and all terms hereof are expressly conditioned upon the obtaining by Lessee of an Occupancy Permit, whereunder Lessee may use the premises for the purposes set forth in paragraph 3 above. In the event the said Occupancy Permit is not obtainable, it is understood and agreed that this Lease Agreement and all its terms, conditions and provisions, shall, at the option of the Lessee, become null and void and of no effect. [Emphasis added.]
It was undisputed that the lessee had filed an application for a certification of occupancy, which had been disapproved. Consequently, the court never decided whether a breach had occurred. In addition, in contrast to this case, the equities there favored the tenant, Evangel Temple, Inc.
[6] In arguing that the equities in this case do not favor the landlord, the dissent states that the landlord gave the new tenant one month of free rent. Not only is this standard commercial real estate practice, but also the landlord gave two months of free rent to the first tenant, Sheina, which was owned by the Licaris, the guarantors of the breached lease.
[1] The lease agreement with Insulation contains 70 paragraphs and an addendum with 21 additional paragraphs. The record is silent as to when plaintiff began negotiations leading to this lease but it is reasonable to assume that negotiations commenced several weeks prior to August 20, 1981.
[2] The trial court found that the following elements comprised plaintiff's claim for damages:

 Rent $17,846.64
 Repairs 7,093.95
 Cleaning 4,284.10
 Utilities 507.22
 Insurance 338.00
 Interest 2,888.51
 __________
 $32,958.42

[3] We observe that the elements of damages that constitute the amended judgment  the original judgment, attorney's fees and costs, and interest  do not equal precisely the amount of the amended judgment:

 Original judgment $19,636.14
 Attorney's fees and costs 11,290.76
 Interest 753.53
 __________
 $31,680.43

[4] Although not relevant to the analysis of the lease in this case, it is interesting to note that the landlord in its lease with Insulation, the new tenant, added the following language to the text of paragraph 25 of the original lease: "[I]n no event shall Tenant be entitled to any monthly excess where the monthly rent collected exceeds the rent reserved."
[5] In my view, the mitigation principles set forth in Sommer v. Kridel, supra, 74 N.J. 446, should apply with equal force to a commercial lease.
[6] However, a landlord who has already invoked a tenant's liability under a survival clause could not unilaterally deprive that tenant of a credit based on the increased monthly rent paid by a successor tenant that has executed or is about to execute the new lease.
[7] Although the majority opinion relies on the Waxman case to support its holding, ante at 445, the credit issue in that case was moot because the tenant was relieved of liability as of the date of the new lease.
[8] Of course, if the total new rent collected through the end of the original term exceeded the original tenant's liability for rent and other damages, such excess would belong to the landlord. Whitcomb v. Brant, 90 N.J.L. 245 (E. & A. 1917).
[9] The majority opinion relies on three other cases in support of its holding. In Schooley v. Wilker, 33 Ohio App. 462, 169 N.E. 829 (Ct.App. 1929), the leasehold premises were vacant for 3 1/2 months. The court held that when the landlord took possession of the premises at the end of the 3 1/2 month period, it terminated the original tenant's leasehold. Thus, the tenant's maximum liability would be for rents accrued prior to the termination. Accordingly, the court determined that there was no basis for allowing the original tenant a credit based on the higher monthly rental received by the landlord upon reletting. There was no survival clause involved.

Similarly, in Trick v. Eckhouse, 82 Ind. App. 196, 145 N.E. 587 (App.Ct. 1924), there was no survival clause and the claim asserted was limited to rent for the two months during which the building was vacant, with no contingent claim asserted against the tenant for damages based on the rent reserved during the remainder of the lease. Accordingly, the court held that the increased rental received from the successor tenant should not be credited to the defaulting tenant.
In D.H. Overmeyer Co. v. Blakely Floor Covering, Inc., 266 So.2d 925 (La. Ct. App.), cert. & writ denied, 263 La. 615, 268 So.2d 676 (1972), the court determined that the landlord had relet as the tenant's agent but declined to allow a credit to the tenant for excess rent received from the new lessee. To the extent that the court adopted an agency theory but declined to credit the tenant with the excess rent, the case appears to be wrongly decided. More important, the landlord's claim did not depend on a survival clause.
[10] The majority opinion cites McCready v. Lindenborn, 172 N.Y. 400, 65 N.E. 208 (1902), for the proposition that language similar to that contained in the survival clause in this case creates a claim for "damages [that] would be measured by the rent lost monthly, not the total rent lost at the end of the lease term." Ante at 441. The Appellate Division in McCready had held that the tenant's failure to pay rent in December, 1894 conferred on the landlord an immediate cause of action for "breach of the lease as an entirety." Id., at 408, 65 N.E. at 210. The lease was not due to expire until 1904 and the landlord had not relet the premises. The Court of Appeals construed the language relied on by the majority merely to limit the landlord's cause of action to damages that had accrued (rent for December, 1894) and would not permit "a recovery of all the damages in advance." 172 N.Y. at 408, 65 N.E. at 210. The decision dealt only with the right of a landlord to accelerate a claim for damages after breach by the tenant and did not determine the measure of damages pursuant to the survival clause in that case.