In the Matter of **TIE/COMMUNICA-TIONS, INC., et al., Debtors.**

**CHATLOS SYSTEMS, INC., Plaintiff,**

v.

**Elbert A. KAPLAN and TX Technologies, Inc., Defendants.**

**Bankruptcy No. 91–362 to 91–386 and 91–436. Adv. No. 92–4.**

United States Bankruptcy Court, D. Delaware.

Jan. 21, 1994.

James L. Patton, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, DE, Michael D. Sher, Lawrence M. Benjamin, Neal Gerber & Eisenberg, Chicago, IL, for Chatlos Systems, Inc.

Stephen W. Spence, Phillips, Goldman & Spence, Wilmington, DE, Sheldon Schachter, Schachter & Stern, Livingston, NJ, for Elbert A. Kaplan Living Trust.

Michael B. Joseph, Ferry, Joseph & Fink, P.A., Wilmington, DE, for TX Technologies, Inc.

### MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

Debtors TIE/Communications, Inc. and Chatlos Systems, Inc. object to the three claims of The Elbert A. Kaplan Living Trust totaling approximately $988,374. Consolidated with these proceedings is a related adversary proceeding Chatlos filed against Elbert A. Kaplan and TX Technologies, Inc. This is the court's decision after trial on these core matters, and after remand from the United States District Court of a related matter. 28 U.S.C. § 157(b)(2)(A) & (B).

### I. Facts

#### A. History of the Rental Property and the Tenancy

The following facts are not disputed. The South–Kap Company of Hanover was a partnership that developed commercial properties. In 1976, South–Kap built and operated an indoor tennis court building at 125 Algonquin Parkway, Whippany, New Jersey. The building was approximately 70,000 square feet and consisted of a pre-fabricated metal structure and a clubhouse. The metal building was divided into three open areas, sometimes referred to as the right, center and left bays. Each bay contained three tennis courts.

In 1979, the metal building was converted to industrial use and South–Kap leased it to C.S.I. Leasehold, Inc. for a ten-year period commencing January 1980. This lease is one of the focal points for the parties' disputes in these proceedings.

The lease was of the net-net-net kind, and imposed many maintenance and pecuniary obligations normally associated with ownership upon the tenant. For instance, paragraphs 7.1 and 7.2 of the lease (hereinafter the repair covenant) imposed upon the tenant comprehensive obligations to repair and maintain all aspects of the interior and exterior of the leased premises. Paragraph 33 obligated the tenant, in extensive detail, to quit and surrender the premises in good condition and repair upon termination of the lease (the surrender covenant). At some point prior to 1988, Chatlos Systems, Inc. acquired the rights and obligations of CSI as a tenant under this lease. In March 1988, Chatlos sublet the building to TX Technologies, Inc. TX has occupied a portion of the building since that time.

In about 1988, title to the leased premises was transferred from South–Kap to Elbert A. Kaplan, a 50% partner in South–Kap. On October 4, 1990, the Elbert A. Kaplan Living Trust was formed and succeeded to the interests of Mr. Kaplan and South–Kap. Kaplan serves as trustee for the Trust.

## II. *Prior Proceedings*

On April 2, 1991, TX filed a Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey. Chatlos, along with its corporate parent TIE/Communications, Inc., and other TIE entities, filed Chapter 11 petitions in this court on April 8, 1991. TIE's and Chatlos' joint plan of reorganization was confirmed in June 1991.

### A. *The Trust's Proofs Of Claims to Which Chatlos Objects*

In the Chatlos and TIE bankruptcy proceedings, the Elbert A. Kaplan Living Trust timely filed three proofs of claims, all relating to the tenancy relationship. Claim No. 853 is an administrative proof of claim for $85,768.02. This amount reflects state envi-

ronmental obligations, and unpaid post-petition rent and tax obligations through the "date of surrender of [the leased] premises."

Claim No. 407, filed May 22, 1991, anticipated a rejection of the lease and seeks rejection damages equal to one year of Chatlos' pecuniary obligations. The claim lists these obligations as $319,023.11 for rent and an estimated $54,390 for taxes, a total of $373,413.11. The anticipatory aspect of this claim was removed when this court approved Chatlos' rejection of the lease on May 29, 1991, with an effective rejection date of June 7, 1991. Case No. 91–362, Docket No. 224.

The Trust filed a third claim (No. 928) for damages arising out of Chatlos' alleged failure to maintain and repair the building. As amended, this claim seeks $529,193.30. Claim Nos. 407 and 928 are general unsecured claims.

Chatlos objects to these three claims.

### B. *The Adversary Proceeding*

After obtaining relief from the automatic stay in the TX Technologies, Inc. bankruptcy proceeding, Chatlos filed an adversary proceeding against Kaplan and TX. The adversary complaint seeks declaratory relief against Kaplan that it is not entitled to recover on the damages claim (No. 928) and, in the alternative, a judgment against TX for any damages to which Kaplan is entitled from Chatlos. TX denied all liability.

Kaplan did not answer the complaint. Instead, "The Elbert A. Kaplan Living Trust Dated October 4, 1990" answered, asserting that *it* was the proper co-defendant. Chatlos has treated the Elbert A. Kaplan Living Trust as the proper co-defendant ever since that answer was filed.

The answer of the Elbert A. Kaplan Living Trust opposed Chatlos' request for relief, and interposed a counterclaim seeking "$81,231.62 and possibly more" for rental payments Chatlos received from TX after June 7, 1991 to which the Trust asserts it is entitled. Subsequent to the filing of the counterclaim, the Trust has written to the court that the parties have amicably resolved the issue of "the $81,000," and that all that remains

before the court is the issue of the allowance of the Trust's claims against Chatlos.

In March 1992, upon Chatlos' motion, this court consolidated the proceeding on the objection to Claim No. 928 and the adversary proceeding.

### III. The District Court's Rulings on Administrative Rent

This court approved Chatlos' rejection of the lease on May 29, 1991, effective June 7. However TX continued to occupy the rental property at this time, and without the Trust's consent. Neither Chatlos nor TX were paying the Trust any rent. Consequently, the Trust moved to compel Chatlos to pay administrative rent. This motion was granted, and Chatlos was ordered to pay rent and taxes in arrears, as well as future rent and taxes, "[u]ntil physical possession of the premises ... without adverse occupancy by either Chatlos or its sub-tenant" was made available to Kaplan. *In re TIE/Communications*, C.A. No. 91–362, Docket No. 280 (Bankr.D.Del. October 31, 1991) (order).

The United States District Court for the District of Delaware vacated this order. *Chatlos Systems, Inc. v. Kaplan*, 147 B.R. 96 (D.Del.1992), *aff'd without opinion*, 998 F.2d 1005 (3d Cir.1993). It held that, pursuant to § 365(d)(4), the sublease between Chatlos and TX was also rejected effective June 7, 1991, and that thereafter, Chatlos had no rights in the property. 147 B.R. at 100. The District Court concluded that Kaplan was not entitled to administrative rent during the period subsequent to that date. *Id.* at 101.

### IV. Discussion of Claim No. 853

The District Court rulings partially resolve the Trust's administrative proof of claim— the Trust's claim for administrative rent sub-

sequent to June 7, 1991 must be disallowed. Furthermore, the parties have · stipulated that Chatlos paid all rent due through June 7, 1991. A–92–4, docket no. 11, at 4, ¶ 11.

The other component of claim no. 853 is Chatlos' alleged liability based upon New Jersey environmental laws. The court does not view the alleged facts as sufficient to support this environmental claim. *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173–74 (3d Cir.1992).[1] The Trust also failed to present any evidence in support of that environmental component, and the briefing does not contain any argument or request any award on the environmental claim.[2] Therefore, the Trust's claim no. 853 is disallowed.

### V. Discussion of Claim No. 407

Claim No. 407 is for loss of rent for one year after the June 7, 1991 termination and breach of the lease. The Trust was eventually successful in securing a replacement tenant by entering into a direct lease agreement with TX. This new lease was effective on February 18, 1992—within the one-year period after June 7, 1991. Therefore, discussion of the Trust's damages shall be divided into two time periods—before and after the replacement tenancy commenced.

### A. The Trust's Actual Damages During the Time Period Before the Trust Secured a Replacement Tenant are $143,308.40.

The rent damages are computed on the basis of, as the lease provides, "the difference between the rent reserved and the rent collected." January 1980 Lease, ¶ 19, at 24. Chatlos concedes that for the time period from June 8, 1991 through February 17, 1992, this amount is $261,577.06.

---

1. The Trust alleges that the termination of the sublease by "TIE/TX" will "trigger the application of the New Jersey Environmental Cleanup of Responsibility Act ... by virtue of N.J.A.C..... This would result in the expenditure of funds for ECRA investigation, delineation, remediation and disposal. Such costs will include legal fees for an environmental consultant in a minimum aggregate of $10,000 plus ECRA filing fees in a minimum of $9,000.00 plus fees for submission and oversight of any necessary cleanup plan,

which fees are determined by the cost of implementation of said plan as well as such costs of implementation which cannot be determined at the present time, but for which the tenant should make appropriate payments as these amounts are ascertained."

2. The Trust's briefing contains an oblique reference to the Trust's Exhibit no. 26. This document does not exist.

Chatlos argues, however, that the Trust is not entitled to any of this amount because it failed to mitigate its rent damages. The Trust acknowledges its burden to show it fulfilled this duty of mitigation. *McGuire v. City of New Jersey*, 125 N.J. 310, 593 A.2d 309, 316 (1991).[3]

■ First, Chatlos argues the Trust did not mitigate its damages because it failed to file a proof of claim in the TX Chapter 11 proceedings or did not otherwise attempt to collect from TX (in the context of *its* Chapter 11 proceeding) for rent Chatlos failed to pay. This argument, however, misconceives the duty of mitigation, which discourages economic and physical waste of the vacant property. The Trust may not sit idly by and exacerbate damages. *E.g., Fanarjian v. Moskowitz*, 237 N.J.Super. 395, 568 A.2d 94, 98–99 (App.Div.1989); *see generally* 11 Walter H.E. Jaeger, *Williston on Contracts*, § 1353, at 2774, § 1359, at 306 (3d ed. 1968). Here, however, TX was occupying a portion of the rental property. Moreover, the Trust did not sit idly by. Instead, it attempted to collect rent from Chatlos, who the Trust in good faith believed was obligated to pay the rent, by filing on July 31, 1991 its motion to compel (discussed in section III). The Trust did not finally lose on that motion until 1993. Therefore, its failure to pursue rent payments from TX in 1991 should not bar recovery of that rent from Chatlos.

■ Second, Chatlos argues that the Trust failed to mitigate its damages because its efforts to relet the vacant portion of the rental unit took too long. On October 1, 1991, the Trust retained Allied Realty for the purposes of leasing or selling the property at 125 Algonquin Parkway. Thereafter, the premises were advertised for sale or lease,

and other related efforts were made to sell or lease the property. For the period after October 1, 1991, these efforts satisfied the Trust's duty to act with reasonable diligence to re-lease or sell the property. However, for the four months between the lease rejection of June 7, 1991 and October 1, no efforts were made to re-lease or sell the property. The Trust offered no reason for this delay and thus it failed to satisfy its mitigation obligations during this initial four-month period. *Fanarjian*, 237 N.J.Super. 395, 568 A.2d at 100. That portion of claim no. 407, equaling $118,268.66, will be disallowed.[4] For the period between June 8, 1991 and February 17, 1992, Chatlos is liable to the Trust for $143,308.40, which is the difference between $261,577.06 and $118,268.66.[5]

**B.** *The Trust's Actual Damages During the Time After TX Commenced Rental Payments to the Trust is $36,722.80.*

■ The second time period at issue in claim no. 407 extends from February 18 through June 7, 1992. In February 1992, the Trust and TX agreed upon a month-to-month tenancy for 35,000 square feet, approximately one-half of the commercial property at 125 Algonquin Parkway. The District of New Jersey Bankruptcy Court subsequently approved this agreement. The effective date of this tenancy was February 18, and TX agreed to pay $13,006.66 for the remainder of that month and $20,000 per month thereafter. Docket No. 19, at 76–77; Chatlos Exhibit No. 45. The Trust has received all payments due under this agreement through June 1992. The rental payments attributable to the time period from February 18 through June 7, 1992 is $77,673.33.[6] Using the monthly rental rate of $31,398.76, the Trust was entitled to receive from Chatlos $114,-

---

3. The parties have properly stipulated that New Jersey law governs all landlord-tenant issues.

4. Chatlos has agreed that the amount of $31,-398.76 reflects the aggregate rent obligation for each month following the termination of the lease. Docket no. 26, at 43. Applying this rate to the time period June 8 through September 30 results in a rent obligation of $118,268.66.

5. Chatlos also argued that this court's October 31, 1991 order compelling payment of administrative rent covered this element of damage and

that therefore the Trust was seeking double recovery. Since that order was subsequently vacated, the premise to this argument has been removed.

6. . June 7, 1992 is the last day for which the Trust seeks rent damages in Claim no. 407. The prorated rent the Trust received from TX for these seven days is $4,666.67. Adding this amount to the rental payments of February, March, April, and May results in a sum of $77,673.33.

396.13 during this time period. The "difference between the rent reserved and the rent collected" during this time period is $36,-722.80.

Chatlos argues, however, that the Trust cannot seek rent for any time after the commencement of the trial on claim no. 407 (April 20, 1992). Chatlos relies upon the "survival clause" of paragraph 19 of the lease [7] and New Jersey case law construing such survival clauses. While the court agrees paragraph 19 is a survival clause, New Jersey law does not limit the Trust to rent accrued prior to the commencement of the trial where the record includes the difference between the rent reserved and the rent collected through June 1992. *N.J. Indus. Properties, Inc. v. Y.C. & V.L., Inc.*, 100 N.J. 432, 495 A.2d 1320, 1324–26 (1985).

In summary, in claim no. 407, the Trust seeks one year's rent after the termination of the lease. The Trust is entitled to $180,-031.20 on this claim as a matter of New Jersey law.

## VI. *Discussion of Claim Number 928*

### A. *Chatlos is Barred From Raising the Improper Party Issue.*

■ In claim no. 928, the Trust seeks to recover $529,193.30 for several alleged breaches of the repair and surrender covenants. Chatlos initially argues that the Trust is the improper party to seek damages for breach of the repair covenant. Chatlos argues the Trust is an assignee of the lease, that this assignment did not occur until after October 1990, that the alleged breaches of the repair covenant occurred prior to this time, and that under general common law, an assignee cannot sue a tenant for such pre-assignment breaches. The Trust argues that Chatlos is barred from raising this improper party issue. The court agrees.

*The Trust* filed claim no. 928 in June 1991, well before the commencement of the adversary, seeking damages "on account of the lease agreement to provide repairs and main-

tenance." Attached to its claim were 14 pages of itemizations providing Chatlos with more than sufficient notice that *the Trust* had specifically relied upon the repair covenant and sought damages for alleged pre-assignment breaches thereof. Despite this notice, Chatlos failed to raise the improper party issue in several pleadings it filed in the Chapter 11 case relating to the Trust's claim. Case No. 91–362, docket nos. 256; 402, at 5; 485; 580.

Chatlos could have also raised the improper party issue in the context of the adversary proceeding which is consolidated with the objection to this claim. However, nowhere in the 28–page joint pre-trial stipulation or any other pleading filed in that proceeding did Chatlos specifically raise this issue.

Chatlos first raised the improper party issue in its post-trial brief (filed on June 19, 1992), taking both the court and the Trust by surprise. Not surprisingly, the record on this issue is deficient. Under these circumstances, Chatlos did not adequately or timely raise the issue that the Trust cannot seek damages for breach of the repair covenant. *Sample v. Diecks*, 885 F.2d 1099, 1106–1107 (3d Cir.1989).

### B. *The Burden of Proof*

The parties dispute who bears the burden of proof on the Trust's claim no. 928. The law is quite clear.

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid.... The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim.... If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the

---

7. Paragraph 19 states in relevant part:
   In the event that [the tenancy terminates] by reason of the default by the tenant.... it is hereby agreed that the tenant shall remain liable to pay in monthly payments the rent which shall accrue subsequent to the re-entry by the landlord....

claimant to prove the validity of the claim by a preponderance of the evidence.

*In re Allegheny Intern., Inc.*, 954 F.2d 167, 173–74 (3d Cir.1992) (citations omitted).

### C. *The Trust's Actual Damages for Claim Number 928 are $176,731.*

The Trust seeks in claim no. 928 $529,-193.30 to repair or replace several discrete damaged items at the property at 125 Algonquin Parkway. Each damaged item is discussed separately below.

#### 1. *The Trust Has Shown $32,875 in Damages to the HVAC Units.*

■ At the inception of the Chatlos tenancy, the premises included 13 fully operating heating, ventilating and air conditioning units. The Trust claims that prior to March 1988 (the date when Chatlos subleased the property to TX), five of these HVAC units were cannibalized, and that the other eight required repairs to enable them to operate properly. The Trust seeks a total of $62,500 for damages to the 13 HVAC units as discussed below. Trust Exhibit No. 46.

■ First, the Trust seeks $47,500 in replacement costs for the five cannibalized units. Chatlos concedes that the five HVAC units were indeed cannibalized, that the Trust is entitled to some measure of recovery for replacement of the five units, and that the replacement cost for the five cannibalized units is $47,500. As Chatlos argues, however, the Trust is not entitled to the full replacement cost. New Jersey law normally measures damages by the cost of repairs. *E.g., Winrow v. Marriott Corp.*, 230 N.J.Super. 189, 553 A.2d 59, 60–61 (App.Div.1989). Where, as here, repair is not possible, replacement damages are measured by the amount to restore the rental property to the condition it was in at the inception of the tenancy, minus depreciation. *S.D.G. v. Inventory Control Co.*, 178 N.J.Super. 411, 429 A.2d 394, 397 (Ct.App.Div.1981). The Trust's argument that *Liqui–Box Corp. v. Elkman*, 238 N.J.Super. 588, 570 A.2d 472, 479 (Ct.App.Div.1990) supports a different measure of damages is without merit.

The termination of the lease and cessation of rental payments did not occur until June 1991. The Trust had no right of re-entry and no need to market the rental property prior to that time. The court will determine the depreciated value of the cannibalized HVAC units at that time.

The evidence showed that the useful life of an HVAC unit is twenty years. In June 1991, the units were approximately eleven years old, with only about 45% of their useful life remaining. Therefore, the Trust is entitled only to 45% of the $47,500 replacement cost—$21,375.

Second, the Trust claims $11,500 to repair the eight HVAC units that were not cannibalized, but were damaged. The lease required that the tenant maintain these units "in good repair." Lease, ¶ 7.1, at 7. The Trust's witness, Peter Zimmerman, owner of Air Systems, Inc., and his mechanic examined the HVAC equipment in June 1991. Zimmerman testified without objection that major repairs to all but one of these units were required to put them into good working order, and that the repairs would total $11,-500. His repair estimate (Trust Exhibit No. 46) on this matter was also admitted into evidence without objection.

Chatlos opposes the $11,500 amount on several grounds. Chatlos points to repairs TX performed "that related to the HVAC system." A–92–4, Docket No. 19, at 49. However, these repairs were performed well before Zimmerman's examination. Also, the evidence does not show that the repairs were performed on the HVAC units (versus the air ducts or other parts of the HVAC system). Therefore, this evidence does not rebut Zimmerman's testimony.

In opposing the $11,500 amount, Chatlos also points to the conclusory testimony of Lewis Atkins, president of TX, that the units were functioning and operational. In contrast, Zimmerman presented a detailed explanation of the problems that existed in each HVAC unit. The court finds Zimmerman's explanation far more persuasive than Atkin's testimony on the issues of the operating condition of each unit, and the repairs needed to put each unit in good working order.

Chatlos also now objects to the Trust's use of Zimmerman's repair estimate of $11,500. This objection was not raised at trial and is therefore waived. The remainder of Chatlos' arguments on the issue of damages to the other eight units are equally without merit. The Trust has proven that repairs to restore the other eight units to good working condition will cost $11,500.

■ The third component of the Trust's $62,500 claim for HVAC damages is a $3,500 amount for repair contingencies—for additional work that likely would be necessary after initial repairs. This amount does not relate to any specific and necessary repair work. The court finds the Trust has not met its burden that this amount is a proper element of its damages, and the $3,500 claim is disallowed. In summary, the Trust has proven damages to the HVAC units in the amount of $32,875.

In the adversary proceeding, Chatlos seeks to hold TX liable for the $11,500 in repairs. Chatlos, however, has not offered any evidence demonstrating that the damages to the eight operating HVAC units occurred after TX commenced its subtenancy. To the contrary, TX arranged with Struble Air Conditioning to provide periodic maintenance to the eight operating HVAC units in exchange for approximately $539 per month. Beginning in February 1989, Struble inspected the equipment at least six times per year, changed the filters four times a year, and performed other routine maintenance. Struble also performed additional repairs costing $6,719.67 that Chatlos itself characterized as "substantial." On this record, Chatlos has not shown that it is entitled to judgment against TX for any portion of the $11,500 in damages to the eight operating units.

### 2. The Trust Has Proven Roof Damage Of $45,500.

The Trust claims approximately $234,000 in damages to the metal roof of the prefabricated building at 125 Algonquin Parkway. The claim is based upon the Trust's belief that the roof must be replaced because of rusting that is so pervasive that it renders the roof structurally unsound. Chatlos argues, however, that the roof is still structurally sound, and that the Trust is entitled only to those costs necessary to repair the rusted roof.

In claiming damages to the roof, the Trust relies upon the surrender covenant [8] and the repair covenant.[9] The proper measure for damage to a roof is discussed in *Liqui–Box Corp. v. Estate of Elkman,* 238 N.J.Super. 588, 570 A.2d 472 (App.Div.1990). The *Liqui–Box* court succinctly stated that case's relevant facts and holding as follows:

> [D]efendant argues that the court erred by not awarding it damages for the cost of completely replacing the roof on the leased premises. The tenant agreed under the lease to keep the building in good repair, order and condition. At the termination of the lease, it agreed to surrender possession of the premises in good repair, order and condition, ordinary wear and tear excepted.... [A]ccording to the judge, the repairs undertaken adequately fixed the leak and there was nothing to indicate that the repairs would not hold until December 31, 1993, the end of the original lease term. Defendant failed to establish that in order

---

8. The surrender covenant states:
   On the last day, or earlier permitted termination of the lease term, tenant shall quit and surrender the premises in good and orderly condition and repair, with floors clean with no foreign materials remaining thereon, and all other facilities.... (reasonable wear and tear ... excepted) and shall deliver and surrender the leased premises to the landlord peaceably, together with all alterations, additions and improvements ... as permitted under the lease. Joint Exhibit no. 1, ¶ 33.

9. The repair covenant states:
   The tenant shall take good care of the leased premises and, at its cost and expense, keep and

maintain in good repair the interior and exterior of the leased premises, including, but not limited to the floor, the roof, the air conditioning and heating plant.... and shall repair and replace all building systems, including the air-conditioning, electrical, heating and plumbing plants.... and shall generally maintain and repair the interior and exterior of the leased premises and shall at the end of the expiration of the term deliver up the leased premises in good order and condition, damages by the elements, ordinary wear and tear excepted. *Id.,* ¶ 7.1.

for the defects in the roof to be corrected, a total replacement was necessary.

*Id.* at 479.

Applying *Liqui–Box* here, as both Chatlos and the Trust ask the court to do, the question here becomes whether the Trust has satisfied its burden of proof that the damage to the building's roof required replacement of the roof. Otherwise, the Trust is only entitled to repairs sufficient to fix the damage through the end of the lease term. The end of the original lease term was December 31, 1989. In 1988, however, Chatlos extended the lease term through December 31, 1994.

The building has three sections, the left bay and loading dock area, the center bay, and the right bay. There is a roof over each of these sections, each consisting of several enamel-coated steel panels. Each panel is fastened with bolts or screws and neoprene rubber gaskets to a steel purlin. The panels should be inspected at least once every three years for significant wear, blistering or rust spots. When one of these problems is noticed, then additional maintenance is required. A rusting roof panel does not necessarily need to be replaced.

The structural integrity of the roof is also affected by the structural integrity of the fastening bolts or screws. These bolts and screws typically rust during the life of the roof. However, whether such rust compromises the fasteners' structural integrity depends on the extent of the rusting. The Trust presented evidence of both rusted fasteners and rusted panels, and relies upon each type of rust as a basis for replacing the roof.

The appropriate remedy for a roof containing rusted panels or fasteners ranges from a localized repair to a replacement of the roof. At trial, three persons testified concerning the degree of rust damage to the roof panels and fasteners, and the steps necessary to restore the roof to good condition—Robert Grimal, Dieter Pfisterer (by deposition), and Carl Walters. As discussed below, the testimony of Pfisterer and Walters sufficiently negates the allegations contained in claim no. 928 pertaining to the roof, as Chatlos is required to do under the *Allegheny* case, and

the Trust has not proved that the roof needs to be replaced.

In 1989, Julia Kaplan, who was managing the rental property, contacted Robert Grimal of Grimal Enterprises to inspect the roof. Thereafter, he visually inspected the roof and walked on it. Walking on a roof is a common technique used to determine its structural integrity. Persons experienced in roof repair can determine the integrity of the roof from the feel of the roof underneath, as well as the sound it makes. *E.g.,* Docket No. 16, at 37–39 (deposition of Dieter Pfisterer).

Grimal also performed invasive testing on a portion of the roof. This test involved cutting out a roof panel section as well as screws and bolts that affixed that panel to the building structure (this panel was later reinstalled). Grimal found rust on the screws, bolts, and roof panels. He observed loose panels and holes in the panels caused by the rusting screws. Grimal believed that no maintenance had ever been performed on the roof and that this lack of maintenance impaired the structural integrity of the roof. He also concluded that the screws' structural integrity had been diminished by the rust and that the rusted screws should be replaced. Furthermore, because the roof panels themselves had rusted and were no longer solid enough to accept new fasteners, new screws by themselves would be insufficient to repair the rust problem. Docket No. 18, at 146–47. Therefore, he concluded, the roof itself needed to be replaced.

According to Grimal, a new roof would cost $167,100, miscellaneous repairs would cost $18,200, and painting the exterior metal panels would cost $9,700. Grimal then added 20% of the sum of these numbers for overhead and profit, resulting in a total of $234,000. The Trust seeks this total in damages.

Ms. Kaplan did not authorize Grimal to proceed with this proposed replacement, nor did she recommend to TX the use of Grimal. Instead, in May 1990, Ms. Kaplan recommended to TX the use of Pfister Industries, a roofing business, to remedy the leaks and rusting in the roof. TX contacted Dieter Pfisterer, president of Pfister Industries, who then also inspected the roof. He walked on the roof and examined the depth of the

rusted areas. He observed wear and rust throughout the three sections of the roof, and rust on the fastener screws.

Pfisterer concluded that all of the roof sections were still structurally sound, but that the rusting warranted repair to all three panels at a cost of $71,250. He proposed repairing the left roof first, because it exhibited the greatest amount of wear.

Thereafter, Lewis Atkins of TX authorized Pfisterer to repair the left bay roof, which Pfisterer did, in the summer of 1990. The rust spots and the areas over the fasteners were first wire-brushed to remove loose rust and other foreign particles. The fastener areas and all rusty areas on the panels were then individually primed. The left roof was then pressure washed, and finally, an asphalt-based paint (Karnak) was applied. Pfisterer estimated the finished surface would last 10 years and would prevent future rusting.

The other sections of the roof were never repaired due to TX's bankruptcy. Pfisterer opined, however, that if the remainder of the roof was properly recoated and maintained, it would also last at least 10 years. This procedure would thus extend the life of the roof well beyond 1994, the end of the lease term.

Grimal inspected the roof once following Pfisterer's repair. He believed such a repair was insufficient to restore the roof.

Carl Walter is a senior consultant at Wagner, Hohns & Inglis who specializes in forensic architecture and the investigation of construction and design deficiencies relating to building systems and materials. He too inspected the roof after Pfisterer had performed the repair to the left bay roof.

Walter walked over the left and center sections of the roof. He did not observe any loose anchors or unusual panel deflection. On the center and right bay areas, he observed localized rusting and pitting of the roof, but found the metal itself to be sound. In particular, Walter noted that most of the rust spots were no bigger than a quarter or half dollar in size. Docket No. 19, at 190–91. He believed that the rusting of the screw fasteners was typical for an older building, and had not compromised their structural integrity.

As to the left bay area, Walter noted proper surface preparation and uniform application of the Karnak coating. He discovered no evidence of any lesions or development of rust through the recoated material. Docket No. 19, at 156. Walters determined that the recoated panels were in excellent condition and that the Karnak coating would prevent further rusting. *Id.* at 164. Also, he believed this coating, if applied to the center and right bay panels, would be sufficient to inhibit rusting and maintain the structural integrity of those sections too.

For the reasons below, to the extent Grimal's opinion is inconsistent with Walter's and Pfisterer's on the issue of the sufficiency of the recoating procedure, the court does not find Grimal's opinion persuasive.

The weight of Grimal's conclusions is severely undercut by the subsequent conduct of both Julia and Elbert Kaplan. In his January 1990 estimate submitted to Ms. Kaplan, Grimal recommended that the roof be replaced. Thereafter, Ms. Kaplan instead recommended Pfisterer to repair the roof. She testified she had absolute confidence in Pfisterer's recommendations and in his work. She accepted his proposal to repair the roof. *See generally* Docket No. 15, at 45–48; docket no. 19, at 63–64. Indeed, in March 1991, Elbert Kaplan requested TX to proceed with the second phase of the repairs as recommended by Pfisterer. Chatlos Exhibit Nos. 38 & 39.

The record includes the result of the recoating procedure that was applied to the left panel. Walter believed this procedure adequately addressed the rust problem on the left bay roof and that this procedure would also address the rust problem on the other two roof sections.

The foundation for Grimal's contrary opinion regarding the sufficiency of the recoating procedure is weak. Unlike Pfisterer, Grimal is a general contractor with no special expertise with sheet metal roofs. While he is generally familiar with the recoating process, his company does not perform that type of work. Docket No. 18, at 133.

The one time he "inspected" the roof after the left bay repair, he did not go up on the roof. He was at ground level and merely looked up to the roof.

Grimal also conceded that a properly performed recoating procedure will stop a panel from rusting. The evidence supports the conclusion that Pfister Industries properly performed the recoating.

Finally, in the two and one-half years since Grimal stated that roof replacement was necessary, no metal panels have become loose or dislodged. Docket No. 18, at 119.

It is not disputed that the left bay roof was in the worst condition of the three roof sections. Since a recoating was sufficient to restore that section to good condition, a recoating should also be sufficient to restore the two other sections to good condition.

Therefore, the Trust is entitled only to the cost of completing the repairs Pfisterer commenced. According to the Trust and the numbers contained in the Pfisterer proposal, this cost is $45,500. Chatlos' argument that the rusting was caused by ordinary wear and tear and that the Trust is not even entitled to this repair amount does not merit independent discussion. *E.g.,* Section V.I.C.3, *infra.* Chatlos' other arguments in opposition to the Trust's requested replacement damages need not be considered.[10]

### 3. *TX is Not Liable to Chatlos for any Portion of the Roof Repair Damages.*

The next and related issue is whether, within the context of the adversary proceeding, Chatlos is entitled to judgment against TX for any portion of the roof damages of $45,500. The first written record of the rusting was in May 1989, 14 months after TX took possession. Chatlos argues this evidence supports its position that the rusting was caused by a failure of TX to properly maintain the roof. The court disagrees.

As a general matter, roof rusting usually develops over a period of time longer than two years. Docket No. 18, at 144. This is a

much longer period of time than 14 months. Moreover, Chatlos did not present *any* evidence that a Chatlos employee performed roof maintenance during the period it was in possession of the building. Indeed, upon his initial inspection of the roof in 1989, Grimal did not observe any evidence that maintenance had been performed upon the roof. Docket No. 18, at 144.

Chatlos relied upon inspections performed by the landlord's property manager. These inspections, however, do not support Chatlos' position. There were four inspections performed between 1982 and 1989. A 1982 inspection report noted various roof maintenance the landlord requested Chatlos to perform. Trust Exhibit No. 4. A 1986 inspection report noted that the repairs requested in the 1982 report were either not done, or needed to be "redone." Trust Exhibit No. 12. Another 1986 document refers to "holes in roof over overhead doors [in the machine shop area.]" Trust Exhibit No. 13, at 4. Atkins confirmed that the roof was rusting at the time TX took occupancy of the building. Docket No. 19, at 88.

Thus, while it is not its burden to do so, TX has affirmatively shown that the rust to the panels and the fasteners occurred over the course of many years and because Chatlos failed to properly maintain the roof. Chatlos is not entitled to recover from TX any amount relating to the roof damages.

### 4. *Chatlos is Liable for $63,000 for Repairs to the Warehouse Floor and Parking Lot.*

The Trust offered the testimony of Arthur Danberg, who worked for Danman Construction Company, to prove requested damages of $63,000 to "install [vinyl composite tile] flooring as a repair," to the floor and parking lot of the warehouse. Trust Exhibit No. 49, at 11. Danberg explained the warehouse floor was originally a composition (cushioned) floor. Chatlos subsequently installed vinyl composite tiles over certain areas of the floor. When Danberg inspected the floor in June 1991, he observed scarring, gashes, and

---

**10.** For example, Chatlos argued that the proposed replacement roof is of higher quality and therefore not equivalent to the original roof, that damages cannot include built-in overhead and profit components and that the Trust is estopped from denying the adequacy of the Pfister proposal.

holes in it. His suggested repair was to replace the existing VCT flooring that was damaged, and cover those portions of the composition floor that were not presently covered with the vinyl tiles.

Chatlos first argues that there is insufficient evidence to prove that the flooring was in good condition at the inception of CSI's tenancy in January 1980. Kaplan, however, testified that the building was in excellent condition at this time. Also, Kaplan's annual inspection reports, which commenced in 1981, did not mention any floor deterioration until 1984. The record is thus sufficient to reasonably infer that the flooring was in good condition in January 1980.

■ Chatlos next argues that the deterioration of the warehouse floor was solely the result of ordinary wear and tear as contemplated by the lease. This argument requires the court to determine who bears the burden of proof on the ordinary wear and tear issue. This issue was not adequately briefed by the parties and there are apparently no New Jersey cases on point. Under the circumstances here, where the Trust has submitted evidence of damage to the floor caused during the tenancy, the majority and better rule is that Chatlos bears the burden to prove the defense that this damage was caused by ordinary wear and tear. 2 Milton R. Friedman, *Friedman on Leases*, § 18.1, at 1099 & n. 103 (3d ed. 1990) (collecting cases). Chatlos has not met this burden.

Finally, Chatlos argues that "even if [the Trust] is entitled to a new floor and a new parking lot," the measure of replacement damages must account for depreciation of the life of the floor. This is a straw woman argument. *In re Columbia Gas System, Inc.*, 133 B.R. 174, 176 (Bankr.D.Del.1991). As Danberg's testimony illustrates, the Trust is not seeking the cost of a new floor or parking lot, but only the cost of repairing the present floor and parking lot. Consequently, depreciation issues do not arise.

Chatlos is liable to the Trust for $63,000 to repair the floor, and Chatlos has not proved any portion of these damages were caused by TX.

5. *The Trust is Not Entitled to the Cost of Removing Rooms 63–76.*

The parties and the blueprints generally refer to the partitions, lobbies, offices, corridors and other areas that were built as "rooms," numbered one through seventy-six. Some or all of the rooms were used by Chatlos, and then by TX.

Claim No. 928 seeks to recover for the cost of demolishing and removing rooms 63–76. The Trust asserts this cost is $62,849.[11] It argues that as a matter of fact either Chatlos or TX installed these rooms. It further argues that as a matter of law, it is entitled to the cost of restoring the premises to the condition the premises were in at the inception of the tenancy. *See generally S.D.G. v. Inventory Control Co.*, 178 N.J.Super. 411, 429 A.2d 394, 397 (Ct.App.Div.1981) (citing *Braem v. Washington Piece Dye Works*, 100 N.J.L. 209, 126 A. 461 (Sup.Ct.1924)).

Chatlos raises several legal issues concerning the applicability of the *S.D.G.* case; however, it is not necessary to address them. As discussed below, the Trust has failed to prove the factual basis for its $62,849 claim.

Prior to Chatlos' occupancy of the building, Kaplan determined it was more economical to operate the rental property as a commercial facility rather than a tennis club. In 1979, the building was converted to industrial use. Joint Pretrial Stipulation, Docket No. 11, at 3, ¶ 4. Towards that end, Kaplan built partitions within the facility to create office space. Docket No. 18, at 75 (testimony of Elbert Kaplan). Chatlos also built some partitions during its tenancy. *Id.* at 55, 78. The parties have also stipulated that:

Some modifications to the Building were made at the commencement of the [1979] lease agreement. Offices were constructed around the perimeter of the old clubhouse.

---

11. The court calculated this amount as follows: In his January 27, 1992 letter to Kaplan, Danberg quotes $32,561 to demolish and remove rooms 63 through 73. In his June 1991 report, he quotes $25,240 (before 10% overhead and 10% profit) to demolish rooms 74 through 76. Adding 20% to this latter figure results in a sum of $30,288. The *requested* total for demolishing all these rooms is therefore $62,849.

A four-inch concrete slab was poured on the floor in part of the left bay.

Docket No. 11, at 3, ¶ 6. Because of its use of the passive voice, this stipulation is unhelpful to the Trust in meeting its burden to show that Chatlos performed these modifications. Finally, the lease itself contemplates that the building would "be altered, converted and modified by landlord for tenant in accordance with plans ... to be mutually approved." Joint Exhibit No. 1, at 2, ¶ 1. Thus, the record does not inform the court which rooms were constructed by Chatlos or TX, and specifically, that either entity constructed any of rooms 63–73.[12] The Trust's claim for $62,849 is denied.

### 6. The Trust has Shown $8,063 for Damages to Rooms 1 Through 73.

The Trust alternatively seeks repair damages to rooms 63–73, and in any case, repair damages to rooms 1–62. Danberg inspected the rental property on June 10 and June 12, 1991. The results of his inspection are summarized in his June 13 report (Kaplan Exhibit 49), which was admitted for all purposes. Docket No. 19, at 19. The report lists those repairs Danberg believed were necessary to repair rooms one through 73, and not the result of normal wear and tear. See Docket No. 19, at 8, 11. Danberg estimated these repairs would cost $29,149. Subsequently, TX repaired some of the listed repair items and Danberg reduced his estimate to $8,063.

Chatlos introduced minimal evidence rebutting the report. Its primary defense are conclusory arguments that the elements of damage listed in the report are costs of renovating or do not account for ordinary wear and tear. These and Chatlos' other arguments are not supported by the record and are without merit. The damages to rooms 1 through 73 are $8,063.

In the adversary proceeding, Chatlos requests a corresponding finding of liability against TX for these damages. Chatlos,

however, has failed to show that any portion of these damages occurred after TX commenced its subtenancy. Accordingly, TX has no liability for these damages.

### 7. Chatlos is Liable for $27,293 on the Remainder of Claim No. 928.

The Trust also seeks other miscellaneous repair damages, all of which are itemized in Danberg's report. Danberg estimates $10,000 to repair warehouse insulation, $3,000 for exterior building touch-up repairs, $4,718 for landscaping, and $9,575 for general site repairs. Chatlos has not suggested any reasons in its briefs why the Trust is not entitled to these amounts under New Jersey law.

The Danberg report also estimates $2,500 to remove a wire mesh fence in the warehouse. This is a fence that TX erected around a stock room for security reasons. This fence is an improvement to the property, and TX intends to remove the stock room and the fence if and when it ceases its tenancy. Under these circumstances, the Trust has not proved entitlement to damages under any of the lease provisions.

Therefore, as to the remainder of Claim No. 928, the Trust has shown damages of $27,293. Of this amount, Chatlos has shown that TX caused the landscaping damages of $4,718.

### VII. The Allowed Amounts of the Claims.

In summary, the Trust has proven damages of $176,731 on claim no. 928 and this amount will be allowed. In connection with claim no. 407, the Trust has proved $180,031.20 in damages. From this amount, the court deducts the security deposit of $45,000 that the Trust holds for Chatlos. Thus, the allowed amount for claim no. 407 is $135,031.20.[13]

### VIII. The Claims are Allowed Against Both Chatlos and TIE.

■■■ Chatlos argues in its reply brief of July 1992 that any claim this court allows

---

**12.** There is evidence that TX improved room 63. Docket No. 19, at 44. This is insufficient to carry the Trust's burden.

**13.** The parties briefed various issues relating to the operation of the "cap" of 11 U.S.C.

§ 502(b)(6). However, since the cap here of $376,785.12 is greater than the sum of claim nos. 407 and 928, none of those issues have legal consequence.

should be allowed only against the Chatlos estate, and not the TIE/Communications, Inc. estate (the "obligor issue").

When the Trust filed claim no. 407 in May 1991, it named in that claim as joint obligors both TIE/Communications, Inc. and Chatlos, Inc. The same is true as to claim no. 928, filed in June 1991. Chatlos failed to raise the obligor issue in the pre-trial order. Indeed, the joint statement of the nature of the action therein states: "The following three claims were filed by [the Trust] against the estates of Chatlos Systems, Inc. ("Chatlos") and TIE/Communications, Inc. ("TIE") . . . ." Docket No. 11, at 1. Chatlos also failed to raise the obligor issue in its opening brief. Under these circumstances, Chatlos is both estopped, *Sample v. Diecks*, 885 F.2d at 1106–1107, and barred from raising this issue. *United States Bankruptcy Court for the District of Delaware, General Order 9C* (October 1, 1992); *Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware*, Rule 7.1.2(c)(2) (August 1, 1992).

IX. *The Trust is not Entitled to Interest on its Claims Before the Date of Allowance.*

▮ The Trust seeks interest on these claims, from June 30, 1991 (the effective date of Chatlos' and TIE's plan of reorganization). As Chatlos points out, the dollar amounts for each of the Trust's claims are not "judgments," but only the allowed amount of each unsecured claim. Treatment of an allowed claim is governed exclusively by the confirmed joint plan of TIE/Communications, Inc. and Chatlos Systems, Inc. An unsecured claim falls within class 4 of the joint plan. Docket No. 181, § 3.04. Under the plan, "each holder of an allowed claim in class 4 will be paid the allowed amount of such claim in full in cash by the reorganized debtor obligated for such claim on or before the later of (a) the effective date, (b) the date such claim becomes an allowed claim. . . ." *Id.* at § 4.03.

Section 4.03 is significant for two reasons. It determines the amount of distribution of each allowed claim, and the timing of that distribution. On the question of the amount of distribution of each allowed claim, section 4.03 does not provide for interest on a claim before the date of its allowance. The request for interest for the time period before each claim becomes allowed is denied.[14]

On the question of the timing of the distribution on the Trust's claims, the effective date has passed, and the Trust has not yet acquired an "allowed claim." The date the Trust first acquires an "allowed claim" will be the date that claim becomes allowed under a final order of this court or a higher court. *Id.* at §§ 1.04, 1.20. Thus, the Trust is entitled to be paid in full for the allowed amounts of each of its claims only when the order of this court or a higher court allowing each of those claims becomes final.

An order in accordance with this Memorandum Opinion is attached.

### ORDER

AND NOW, January 21, 1994, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1.  Claim No. 853 of The Elbert A. Kaplan Living Trust is disallowed.

2.  Upon remand from the United States District Court for the District of Delaware of the Trust's motion to comply (docket no. 280), the Elbert A. Kaplan Living Trust is entitled to administrative rent from the petition date of April 8, 1991 through June 7, 1991. This rent has already been paid and the Trust is not entitled to any additional monies relating to this motion.

3.  Claim No. 407 of the Elbert A. Kaplan Living Trust is allowed against the estates of TIE and Chatlos in the amount of $180,031.20.

4.  Claim No. 928 of the Elbert A. Kaplan Living Trust is allowed against the

---

**14.** The issue of whether the Trust is entitled to interest on its claim or claims *after* the date of allowance is not before the court.

· estates of TIE and Chatlos in the amount of $176,731.

5. No interest on either Claim No. 407 or Claim No. 928 is allowed for the time period before the date of allowance.

6. In the matter of adversary proceeding A–92–4, judgment is entered for Chatlos and against TX Technologies for $4,718. TX is not liable to Chatlos for any other portion of Claim No. 928.

7. In the adversary proceeding A–92–4, the Trust's counterclaim for $81,231.62 is dismissed without prejudice.